**UNITED STATES of America,**
**Appellee,**

**v.**

**SING KEE, Appellant.**

**No. 90, Docket 24624.**

United States Court of Appeals
Second Circuit.

Argued Oct. 10, 1957.

Decided Dec. 6, 1957.

Writ of Certiorari Denied March 3, 1958.
See 78 S.Ct. 538.

Menahem Stim, New York City (Allen S. Stim, Norman L. Kee and Curran, Mahoney, Cohn & Stim, New York City, on the brief), for appellant.

Gerard L. Goettel and Arthur B. Kramer, Asst. U. S. Attys., Southern District of New York, New York City (Paul W. Williams, U. S. Atty., Southern District of New York, New York City, on the brief), for appellee.

Before CLARK, Chief Judge, and LUMBARD and MOORE, Circuit Judges.

LUMBARD, Circuit Judge.

This appeal turns on whether it was error for the government to cross-examine defendant's witness Samuel Waterman to disclose that he had asserted the shield of the Fifth Amendment to avoid answering certain questions put to him before the grand jury. We hold that in the setting of this case the cross-examination was proper and accordingly we affirm the conviction.

Sing Kee appeals from a judgment of conviction and sentence entered on March 5, 1957, after a jury, presided over by Judge Richard H. Levet in the Southern District of New York during a ten day trial, found him guilty on four counts. Count 1 charged that the defendant, from 1949 until indictment in May 1956, conspired with certain named and unnamed persons to violate the Immigration Laws of the United States, 18 U.S.C.A. §§ 371, 1425 and 1542, and 8 U.S.C.A. § 1324. The other three counts charged that Sing Kee on three separate occasions, in 1951 and 1952, wilfully and knowingly made false statements in applications for passports with intent to induce and secure the issuance of passports for the use of others by stating, when he knew it to be untrue, that the applicants were the sons of named persons, 18 U.S.C.A. §§ 2, 1542 and 3238. A fifth count, which also charged a false statement in a passport application, was dismissed at the close of the government's case. The defendant was sentenced to 2½ years and fined $1,500 on each count, the prison sentences to run concurrently.

The government's proof to sustain the conviction was abundant and convincing. In summary, the evidence disclosed that Sing Kee, while operating the China Overseas Travel Service at 11 Mott Street in New York's Chinatown, was also engaged in preparing and processing passport applications for Chinese attempting to gain entry into this country by posing as sons of Chinese-American citizens. The Chinese immigration quota of 100 each year, 8 U.S.C.A. § 1151, virtually limited immigration from China to those who were derivative citizens by virtue of the American citizenship of one of their parents.

The scheme was, in general, as follows: Chinese-American citizens or alleged citizens, married in China while on visits to that country or before original entry into the United States, would make fictitious reports to the immigration authorities of sons born to them in China or would fail to report the deaths of sons who had resided in China. Immigration records would accordingly list a citizen son not actually in existence. The "slot" thus created would be sold by the "parent" for prices usually ranging from $1,000 to $1,800 to a Chinese in the United States who desired to bring over a youth comparable in age to the fictitious son. Sing Kee would prepare or would have prepared the necessary passport applications and supporting affidavits and would produce coaching books called "halgoons," from which the applicant, in Hong Kong, could obtain the necessary basic facts concerning the family of which he claimed to be a son. This information was necessary to substantiate the claim of derivative citizenship and thus enable the applicant to come to the United States as a citizen. Sing Kee usually received for his services from $400 to $600, part of which he paid to attorneys and others. In six

separate cases there was evidence that Sing Kee was well aware that the "sons" were not sons. In one case it was testified that Sing Kee himself arranged to buy a slot from a father.

Several persons were involved, wittingly or unwittingly, in the transactions giving rise to the prosecution. A physician and a serologist, Doctors Liu and Sussman, determined the compatability of the blood of the alleged sons with that of their supposed parents so as to weed out the incompatibles. A brother of the defendant, Albert Kee, a friend, Wilbur Chung, and a notary public, Louis Treglia, all performed services incidental to the conspiracy. In addition, one attorney prepared affidavits, usually for $25, and another followed the course of these matters through the State Department for fees of from $25 to $75, and both attorneys transmitted the affidavits and passport applications to the appropriate authorities.

In those cases where the State Department refused to issue passports to the spurious sons, Sing Kee referred the "parents" to Samuel Waterman, an attorney who had offices at 111 Broadway in lower Manhattan. Waterman filed suits in the federal courts under § 503, Nationality Act of 1940, 54 Stat. 1171, on behalf of the "parents" for declaratory judgments that their "sons" were citizens. Between mid-1951 and December 24, 1952, the date after which such suits could no longer be brought by reason of the provisions of the Immigration and Nationality Act of 1952, § 407, 66 Stat. 281, 8 U.S.C.A. § 1101 note and 8 U.S.C.A. § 1503, 66 Stat. 273, Waterman filed between 50 and 75 such cases referred to him by Sing Kee. Among these were suits in which Hom Wing Gim, Moy Mun Sing and Chin Kung Chee were plaintiffs. Hom Wing Gim

and Moy Mun Sing testified that they had sold "slots" and thereafter had made arrangements with Sing Kee in such wise that the jury could well conclude that Sing Kee knew that the passport applications which he caused to be filed in Hong Kong and the civil complaints were fraudulent and false. In the case of Chin Kung Chee the jury could well conclude that Sing Kee knew the complaint to be spurious. On cross-examination all three "fathers" were asked whether they had met and talked with their attorney Waterman. Each of them testified that they had not talked with Waterman but that they had gone to his office, had signed papers, and had dealt with persons other than Waterman.

### The Defense

Sing Kee testified on his own behalf and conceded that he had assisted in bringing in many sons and attempted to bring in others. He denied knowledge of the fraudulent nature of any of the claims and that he had prepared any halgoons. He claimed that he had received only small sums for expenses, although he admitted that he had netted $23,000 in 1951 and 1952 after expenses.

Apart from character witnesses, Waterman was the only other defense witness. He testified that the information upon which he had brought the suits involving derivative citizenship claims of Chinese was given him by the fathers, that he had no knowledge of any fraudulent claim and that he had no reason to believe that Sing Kee had any such knowledge.

Waterman swore that he had met and talked with Hom Wing Gim, Moy Mun Sing and Chin Kung Chee prior to filing complaints on their behalf.[1] In this respect his testimony conflicted with theirs as they had denied meeting him.

---

1. In his testimony before the grand jury Waterman was not sure whether he had discussed their cases with Hom Wing Gim, Moy Mun Sing and Chin Kung Chee. At the trial he testified that he had refreshed his recollection after his grand jury appearance and he remembered going over the details with them before drawing up the complaints.

Waterman testified on cross-examination that the fees he received through Sing Kee were deposited in his checking account in the Trust Company of North America at 115 Broadway and that he kept records of these fees on his check stubs and in the individual case files. The government was then permitted to bring out, over defense objection, that in his testimony before the grand jury Waterman had claimed his Fifth Amendment privilege not to answer questions regarding his fees and records on the ground that the answers might tend to incriminate him.[2]

We hold that in the setting of this case, and considering especially the entire examination of Waterman and the weight and significance of his testimony, the relevance of Waterman's grand jury claim of privilege outweighed the danger that the jury would draw from it any impermissible inference regarding Sing Kee's guilt of the charges for which he was on trial.

Waterman testified to a relatively minor facet of the case, namely, whether he had or had not talked with the "fathers" before filing suit for them. If on this point the jury disbelieved the three "fathers" that, of course, would cast suspicion on their credibility as to the more important testimony concerning Sing Kee's guilty knowledge that the "sons" were spurious. Waterman's testimony did not go to the heart of the case; it merely contradicted three witnesses on a minor matter which at best could only raise a question as to their credibility.

Defendant asks us to reverse the convictions on the authority of Grunewald v. United States, 1957, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931. We do not agree that Grunewald requires reversal under the circumstances of this case. Grunewald requires an *ad hoc* determination by the trial judge, wherein he must balance two competing considerations in the light of all the circumstances

2. The following appears in the trial minutes:

"Q. Mr. Waterman, were you asked the following questions before the Grand Jury * * * 'Q. When you received these various payments, what did you do with them?' And the next question was * * *

"Q. And were you asked before the Grand Jury as follows, the following questions: 'Q. Where would you deposit them? What Bank?' Were you asked those questions? A. I assume that I was, if you have it there, in the minutes.

"Q. Were you also asked this question: 'Q. What sort of books and records do you keep?' A. I have no recollection whether I was asked that. If you have it there, I will concede that I was asked it.

"Q. Do you recall the answers you gave to those questions? A. I do not at this time.

"Q. Where would you deposit them? Q. What bank?', and then, 'Q. What sort of books and records do you keep?' When you were asked those questions, did you reply that any answer might incriminate you?

"Q. Did you claim your rights under the Fifth Amendment before the Grand Jury in answer to those questions?

"A. If it is stated there that I did, I did.

"Q. I want a yes or no answer, whether to the best of your recollection you claimed the Fifth Amendment when you were asked those questions.

"A. I do not recall whether I did or not.

"Q. Do you recall making these answers to these questions: 'Q. What bank? A. I refuse to answer, Mr. Goettel.

"'Q. On what grounds? A. On the grounds that it may incriminate me.'

"Q. Do you recall making those answers at that time? A. I don't recall it, but if it is down in the minutes there, then I made it.

"Q. Do you recall making this answer to the questions: 'Q. What sort of books and records do you keep? A. I refuse to answer on the grounds that it may incriminate me.' A. I don't recall it but the same thing, if it is down there, then I made it."

of the case—the extent to which the prior claim of privilege affects the credibility of the witness and the possible impermissible impact on the jury occasioned by a showing of the prior plea. The trial judge did not abuse his discretion by permitting the cross-examination of Waterman.

As in Grunewald, the answers given by Waterman on cross-examination at trial were not necessarily inconsistent with the claim of the privilege before the grand jury. Although by themselves his answers to the specific questions did not tend to connect him with Sing Kee, neither were they exculpatory. Indeed, exculpatory testimony is not necessarily inconsistent with a prior plea of the Fifth Amendment. See United States v. Tomaiolo, 2 Cir., 249 F.2d 683.

Here, however, there was an inconsistency between Waterman's answers before the grand jury and the inference raised by his testimony at trial regarding his conduct before the grand jury. Defense counsel questioned Waterman on direct examination about his appearance before the grand jury, as follows:

"Q. By the way, Mr. Waterman, were you a witness before the Grand Jury? A. I was, sir.

"Q. And did you give the Grand Jury the same testimony that you are giving us here, substantially? A. Well, if I was asked the same questions.

"Q. Was the testimony true that you gave to the Grand Jury? A. As far as I know, yes, sir.

"Q. What I mean is, was it true, as far as you knew? A. That's right.

"Q. And you had your files with you? A. I think I did."

The answers given by the witness were factually accurate, but they were capable of a much broader interpretation. The defendant would have had the jury believe that Waterman had been a cooperative and candid witness before the grand jury, thereby bolstering his credibility. Having brought the conduct of the witness before the grand jury into issue, the defendant cannot now complain that the government was permitted to develop all that happened so as to rebut an inference which was contrary to fact. The rule enunciated in Grunewald was intended to implement the constitutional guarantee against self-incrimination; it was not intended to permit a defendant to draw out part of the facts from a witness while foreclosing the government on cross-examination from developing all the facts so that the partial account is not misleading. Cf. Walder v. United States, 1954, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503.

But to hold that the plea of the Fifth Amendment was inconsistent with the inference raised by the witness' testimony on direct examination and hence was material in impeaching his credibility is but half the answer. We must go on to consider the possible impermissible impact on the jury.

Here the crucial question is whether the jury would be likely to equate Waterman's refusal to answer these few questions before the grand jury with the defendant's guilt. If the danger that the jury's knowledge of the prior plea might have been improperly carried over so as to affect its belief in the defendant's innocence or guilt outweighed the effect on credibility, then evidence of the prior plea should have been excluded. See Travis v. United States, 10 Cir., 1957, 247 F.2d 130.

We do not believe that, in the circumstances of the case, the dangers of an impermissible impact on the jury were such as to override the considerations justifying admission. Unlike Grunewald, the witness in this case was not a defendant. Since Waterman did not file the civil actions until the passport applications had been administratively denied, his contact with the defendant as to each transaction occurred subsequent to the filing of the fraudulent application. Because his involve-

ment in Sing Kee's activities was merely peripheral, Waterman's testimony was directed to and conflicted with prosecution testimony only regarding his procedure in filing civil actions. The danger that the jury would believe Sing Kee to be guilty because of his association with Waterman, who had pleaded the Fifth Amendment, was minimal. As it was, the trial judge immediately instructed the jury that the raising of this issue was "not in any way to reflect upon the defendant."[3] There was not the kind of intimate relationship between Waterman and Sing Kee which might cause the jury to consider the actions of one the actions of the other. See United States v. Tomaiolo, supra, where the witness who pleaded the Fifth Amendment was the defendant's brother.

The thrust of the questions which Waterman had previously refused to answer was even more remote from the heart of the case than Waterman's contradictions of the testimony of the three prosecution witnesses. Unlike United States v. Tomaiolo, supra, the questions were not so intimately related to the details of the crime that a jury, coupling the answers at trial with the prior plea, would be likely improperly to infer facts directly bearing on defendant's participation in the crimes charged. Even if the jury had equated Waterman's prior plea with his guilt of a criminal act, it does not follow that it would go on to infer that the criminal acts involved Sing Kee. Much evidence was introduced to establish what Sing Kee was paid and the moneys he disbursed in handling passport matters and most of this was not disputed.

The questions which Waterman refused to answer related to his handling of his personal funds after receipt from the defendant, an inquiry without direct bearing on Sing Kee's knowledge of the spurious nature of the claims, and Waterman had freely testified to his relationship with Sing Kee. The possible reasons for Waterman refusing to divulge facts regarding his handling of his personal finances were so varied[4] that, in our opinion, there was not a substantial likelihood, under all the circumstances here attendant, that the jury would indulge in speculations which would result in their equating the witness' refusal to testify with the defendant's guilt.

Sing Kee complains of two other matters as constituting error, both of which we find without merit. On his cross-examination he was questioned from tax returns submitted by him for the years 1951 and 1952, the returns being used to refresh his recollection. At that time appellant's counsel objected to the use of the returns on the ground that they could be used only in an income tax case. This objection was properly overruled. Lewy v. United States, 7 Cir., 1928, 29 F.2d 462, 62 A.L.R. 388, certiorari denied 279 U.S. 850, 49 S.Ct. 346, 73 L.Ed. 993; United States v. Rollnick, 2 Cir., 1937, 91 F.2d 911, 918. It is now urged that the government failed to show that the returns had been obtained in accordance with 26 U.S.C.A. § 6103 (a) and 26 CFR 601.702 (1956), 26 CFR 458.204 (1939). The government was never asked to produce such authorization at trial, but the government asserts

---

3. The defendant requested no further charge to the jury on this point and none was given. Under these circumstances it was not required that the judge instruct the jury again in the charge, but it seems to us that such a charge would have been desirable to make sure that the jury clearly understood the limited purpose of the fact that a witness had previously pleaded the Fifth Amendment to certain questions.

4. If the jury were improperly to draw any inferences of guilt from Waterman's plea of privilege it seems more likely that they would infer that Waterman feared investigation with respect to income taxes, failure to report payments of money to others, or the like, all matters quite foreign to the charges against Sing Kee and Sing Kee's possible guilt.

**242**

that it was prepared to do so if the point had been raised. When the trial judge correctly overrules a specific objection, it cannot be argued on appeal that the evidence, or, as here, the use of returns to refresh recollection, was improper for a different reason. Norwood v. Great American Indemnity Co., 3 Cir., 1944, 146 F.2d 797. Such an afterthought deserves no attention, especially where it is apparent that the government could have satisfied the court as to the ground now belatedly urged.

Appellant also charges that there was a variance between the indictment and proof, since the evidence disclosed six separate conspiracies rather than one. Even if we assume that such a variance exists, it is not fatal to the conviction as it did not affect the substantial rights of the accused. Berger v. United States, 1935, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314. This is not a situation where a defendant involved in one conspiracy has been convicted in a mass trial encompassing numerous other conspiracies involving matters and persons entirely unknown to him; nor are there any questions relating to the admission of statements by alleged co-conspirators as in Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. Here Sing Kee was the only defendant; he was the key figure in all that transpired. Since the principal government witnesses are named in the conspiracy count and since four of the transactions served as bases for the other counts, it is evident that the defense was not taken by surprise by the evidence at trial. Nor is there any danger of another prosecution for the same offense. See Berger v. United States, supra. Thus there is no merit to Sing Kee's claim of error on the ground that the proof showed numerous conspiracies rather than one. Monroe v. United States, 1956, 98 U.S.App.D.C. 228, 234 F.2d 49; Quirk v. United States, 8 Cir., 1947, 161 F.2d 138.

The judgment is affirmed.