**UNITED STATES of America,**
**Appellee,**

v.

**Sidney GLASSER, Appellant.**

**No. 626, Docket 34970.**

United States Court of Appeals,
Second Circuit.

Argued March 4, 1971.

Decided May 21, 1971.

Jack Kaplan, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., James Schreiber, Maurice M. McDermott, Ross Sandler, and Walter M. Phillips, Jr., Asst. U. S. Attys., on the brief), for appellee.

Henry J. Boitel, New York City, for appellant.

Before LUMBARD, KAUFMAN and ANDERSON, Circuit Judges.

LUMBARD, Circuit Judge:

Sidney Glasser appeals from a judgment of conviction entered in the Southern District of New York on April 17, 1970, after a jury trial before Judge Motley. Glasser was convicted on Count I for conspiracy to affect interstate commerce by means of extortion, in violation of 18 U.S.C. §§ 371 and 1951, and on Counts II and III for actually affecting interstate commerce through extortions, in violation of 18 U.S.C. §§ 1951 and 2. He was sentenced to concurrent prison terms of five years on each count and was fined a total of $20,000—$10,000 on each of Counts I and II. The prison sentence was suspended, and a two-year period of probation was imposed by the court. We affirm Glasser's conviction on the conspiracy count, and reverse his conviction on Counts II and III.

Glasser, the dominant officer of the only union representing plate glass installers in the New York metropolitan area, was indicted and tried with two co-defendants, Sam Kaplan and Larry Hill, also officers of the glaziers' union.

Count I of the indictment charged that from December 1, 1964 until March 6, 1969, the three defendants engaged in a conspiracy to interfere with interstate commerce by spraying a special type of acid on, and thus causing damage to, windows which had been installed by nonunion glaziers, thereby having an extortive effect on (a) the nonunion installers of such glass, (b) the owners of shops requiring installation of such glass, and (c) the insurance companies which insured the windows, because, after these incidents of spraying, Glasser allegedly sent lists of unionized glaziers to the insurance companies. Counts II and III charged the defendants with affecting interstate commerce by means of such extortions, committed on July 14, 1967 and September 10, 1967, respectively. Although Glasser was convicted on all three counts, Hill was convicted only on Count I and was acquitted on Counts II and III, and Kaplan was acquitted on all counts. Hill's appeal has been withdrawn.

At trial the government's chief witness was one Sheppard Gellert, who had been employed by the union as assistant financial secretary. Gellert testified that acid was kept in the union's basement and that spraying it on a nonunion window was referred to as "doing a job" or "pissing up a window." Gellert stated that he himself received the reports of nonunion job sites, collected them in a book and thereafter gave them to Kaplan. Kaplan in turn passed the information to Glasser for aciding, but only, as Kaplan explained to Gellert, after he, Kaplan, has personally determined that the glass should be acided.

Gellert also testified that he had spoken to Glasser on certain occasions about the aciding and that he had overheard certain conversations between Glasser and Kaplan respecting the aciding. He stated, for instance, that in 1965 he overheard Glasser and Kaplan discussing the accidental spraying of a *union* job. In this particular case, Glasser stated that although this was a union job, it would teach the "so-and-so

* * * a lesson." Another time in 1965, Gellert stated, he saw Glasser rush into Kaplan's office and he followed. In the ensuing discussion, Glasser showed Gellert a news article disclosing that the Westchester district attorney was going to investigate acidings of plate glass. Gellert asked whether the article referred to "one of our jobs" and Glasser replied, "No, we didn't do it." A few days later, Gellert was told by Kaplan, that although they did not do the particular aciding in question, Glasser "was worried because it put the heat on."

Gellert also testified that Hill had admitted to him that he did aciding for the union. For example, on many occasions throughout 1964 and 1965 and earlier, Hill complained to Gellert that although he did aciding for the union, he never received any money for it. Once in late 1964, Gellert saw a container of acid in the back of Hill's station wagon. Toward the end of 1964, Gellert was at the office working late one day when Hill telephoned saying that he was coming down to the office to drop off some medical forms since he had to come down anyway to do an aciding job for Glasser that night. Subsequently, Gellert told Glasser that it was risky using Hill to do aciding jobs because he was unstable. Glasser replied "Don't worry, I can control him."

Gellert testified, moreover, that on several occasions he had witnessed the delivery of acid to the union headquarters, and once he saw Glasser take the acid into his office. Finally, Gellert stated that his duties with the union included sending to insurance companies at Glasser's direction lists of certain unionized glaziers, accompanied by a covering letter from Glasser requesting that the insurance companies select only the shops on the list.

The government next offered the testimony of various shopowners and glaziers to the effect that numerous non-union installations were damaged with acid during the course of the alleged conspiracy and that thereafter the damage was repaired by union glaziers hired by insurance brokers. Finally, the government relied on the union's avowed policy that members were required to report nonunion installations to union headquarters, although they were cautioned to avoid using a telephone in rendering such reports.

For the defense, Glasser testified in his own behalf and denied any personal involvement in any of the acts charged. The defense also attacked Gellert's credibility on the basis of his admitted hatred for Glasser and on the basis of his psychotic background. Finally, the defense claimed that the government totally failed to connect Glasser or the union with any of the acts charged.

In seeking reversal of his conviction, Glasser makes several claims of error: (1) that various items of evidence were admitted in violation of the rule against hearsay; (2) that the district court erred in permitting the prosecution to impeach Glasser on cross-examination and through rebuttal evidence concerning an act which occurred in 1960 and was not charged in the indictment; (3) that the court erred in denying Glasser access to a psychiatric report of a government witness; (4) that the court erred in permitting the government to impeach three defense witnesses by eliciting from them the fact that they had claimed their Fifth Amendment privilege against self-incrimination before the grand jury; and (5) that the evidence was insufficient to support the jury's verdict on any of the three counts.

I. Glasser contends first that various items of evidence were admitted at trial in violation of the rule against hearsay and of his Sixth Amendment right of confrontation.

1. Gellert testified without objection on direct examination that codefendant Hill had told him that "he did aciding for the union and that he put his life on the line and nobody appreciated him and that he never got any money for it, and things of that nature." On redirect ex-

amination of Gellert, the following exchange occurred:

"Q. Did Mr. Hill mention anything about acidings at that time and during that party?

"[Defense counsel]: I object. It is not proper redirect.

"The Court: Overruled.

"[Defense counsel]: Exception.

"A. He got drunk. He was loaded and he started to curse very badly and he started to talk about—he was mad at Sidney and Sidney Glasser doesn't appreciate him and he does—he puts his life on the line; he does aciding for Sidney and Sidney is so and so, along that line, and we had quite a job shutting him up."

Glasser argues that Gellert's statements were hearsay and also violated the Sixth Amendment under the rule of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In Bruton, the Supreme Court held that the admission of a nontestifying codefendant's extrajudicial statements at a joint trial violates the Sixth Amendment's right of cross-examination where those statements inculpate the defendant.

■■■ Since there was no objection on hearsay grounds to the admission of Gellert's statements at trial, Glasser's claim is not available on appeal unless that admission was plain error. Rule 52(b), Fed.R.Crim.P. Hill's extrajudicial statements were spontaneous and clearly against his penal interest. With these indicia of reliability, it is unlikely that cross-examination would have significantly weakened the effect of the statements in the jury's mind. Cf. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L. Ed.2d 213 (1970) (opinion of Stewart, J.). Moreover, there was no way in which the trial judge could have forecast that Gellert's answer to the question asked would have inculpated Glasser. Finally, in light of the overwhelming evidence of Glasser's involvement in the conspiracy, established particularly by Gellert's other testimony, the admission

of this statement, if error at all, was clearly harmless. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967). Under all these circumstances, we cannot say that the admission of Gellert's statement constituted plain error.

2. Leo Durocher, the owner of a victimized shop in Manhattan, testified, over defendant's objection, that he found a note after the aciding of his window, warning that when the glass was to be replaced, he was to make sure that it was "union glass." Durocher did not produce the note at trial, because he did not know where it was. Glasser argues that this testimony was hearsay and was in no way connected to him.

■■ We disagree. The note was found immediately after the aciding of plate glass installed by nonunion glaziers —precisely the objective of the unique conspiracy of which Glasser was a member. The circumstances of finding the note at the scene of such an event, coupled with the contents of that note, make the note sufficiently relevant to the conspiracy charge to permit its admission into evidence. See Carbo v. United States, 314 F.2d 718, 742–43 (9th Cir. 1963), cert. denied sub nom. Palermo v. United States, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); Gridley v. United States, 44 F.2d 716, 740 (6th Cir. 1930), cert. denied, 283 U.S. 827, 51 S. Ct. 351, 75 L.Ed. 1441 (1931). Indeed, Glasser conceded at trial that this testimony was admissible under Carbo but contended merely that the court in the exercise of its discretion should exclude it. In view of the circumstantial evidence pointing to some member of the conspiracy as the writer or deliverer of the note, we cannot say that the district judge abused her discretion in admitting this testimony. The note was admissible as an utterance which was contemporaneous with an independently admissible nonverbal act—the aciding—and which relates to that act and throws some light upon it. United States v. Annunziato, 293 F.2d 373, 377 (2d Cir.), cert. denied,

368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).

3. Joseph Randazzo, a store owner from Brooklyn, testified, over objection, that he received a telephone call from a person identifying himself as from a union shop, warning him that if he hired a nonunion shop to replace his window, he would have trouble. He did hire a nonunion shop and the next day the store window was acided. Glasser contends that this testimony was hearsay and the call not connected with him.

■ However, the statement made by Randazzo's caller was relevant not only because of the probative value of the assertion made therein, but because it tended to show that persons in the glazing business anticipated difficulty when nonunion workers installed glass. Widespread awareness of this danger was obviously a necessary element of the scheme with which Glasser was charged. We therefore cannot say that the trial judge abused her discretion in admitting this item of evidence.

4. William Chustckie, a nonunion glazier, testified over objection that he received a call from a customer in Brooklyn who told him that he (the customer) had received a warning that since the glazier was nonunion, the customer's store would be acided. Chustckie then called Glasser and Glasser told him not to worry and that nothing would happen. Nothing did happen. Glasser argues that Chustckie's testimony as to the warning which his customer received was double hearsay and that Glasser's response not to worry had no probative value as implicating Glasser in any aciding.

■ While we agree with the defendant that Chustckie's testimony as to the warning was hearsay, it does not follow that it was therefore inadmissible. The warning was virtually contemporaneous

with Chustckie's act of contacting Glasser, and threw significant light upon it. See United States v. Annunziato, *supra,* at 376–377; Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229, 236 (1922). Indeed, if Chustckie had not been permitted to recount the warning conveyed by his customer, his telephone call to Glasser would have appeared to be an arbitrary and almost senseless act. Of course, Chustckie's testimony as to his conversation with Glasser and Glasser's statement not to worry was, by itself, not hearsay, and could only have been relevant in conjunction with the hearsay testimony about the warning. But even conjoined with that prior testimony, as Glasser himself argues, his statement not to worry was in no way an admission of his involvement in the conspiracy; and as we believe that the jury would not have seen it as such an admission, we can only conclude that the jury would not have reached a different verdict if Chustckie's testimony had not been admitted.

5. Joseph Cohen, another nonunion glazier, testified that while installing plate glass in Brooklyn in 1962, a stranger approached him and inquired about his union status. Cohen replied that he was nonunion. The man then walked across the street and entered a drug store. The next day the glass that Cohen had installed was damaged by acid. Although Glasser did not object to this testimony on hearsay grounds at trial,[1] he now contends that it was hearsay and proves nothing.

■ We reject this contention. Inasmuch as the stranger merely inquired as to Cohen's union affiliation, the question was not hearsay. It was not admitted for the truth of what was said, but solely because it occurred. The incident was also independently admissible as contemporaneous with a non-verbal act

---

[1]. Glasser did object to Cohen's testimony on the ground that it antedated the alleged conspiracy by two years; and when Cohen stated that the stranger entered

a drug store and "presumably made a telephone call," Glasser objected to "what [Cohen] presumes."

and as explanatory of the act. United States v. Annunziato, *supra*, at 377. Furthermore, the testimony was properly admitted under Carbo v. United States, *supra*, as circumstantially showing that Glasser's instruction to union members to report locations of nonunion installations was being followed. Since we find no plain error in the admission of Cohen's testimony, this claim cannot be made on appeal.

II. Glasser's second contention is that he was denied a fair trial when the court permitted the prosecution to impeach him on cross-examination and through rebuttal evidence concerning an act of misconduct which allegedly occurred in 1960, four years before the alleged conspiracy here had commenced, and which was not charged in the indictment.

In 1960, one Albert Propper, a member of the glaziers' union, was convicted of spraying acid on the windows of a store in Long Island which had recently been installed by a nonunion shop. At that time Propper stated that he had done this act on his own whim. Shortly before the trial in this case, however, he claimed that Glasser had directed him to do the aciding in 1960. At a pretrial hearing in this case, Judge Motley ruled that the 1960 Propper incident was "inadmissible on the ground that it would be too highly prejudicial to the de-fendants because it is too far removed in time from the allegations in this indictment and that great period of time makes the events of that early date not particularly probative with respect to the conspiracy alleged in the indictment here."

At trial, Glasser testified that he "did not conspire with any man to spray acid on any job at any time." When on cross-examination he reiterated this, the prosecutor was permitted, over defense counsel's persistent objections, to question Glasser about the 1960 Propper incident.[2] Glasser denied any complicity in the event.[3] As part of its rebuttal, the government called Propper; and over defendant's objection, Propper testified that Glasser had directed him to do the aciding job in 1960. At no time did Judge Motley retreat from her earlier announced position that the incident was inadmissible in support of the charges in the indictment. Her ruling was that the Propper testimony would be admitted solely as to the credibility of Glasser.

Glasser contends that the trial court erred in permitting him to be cross-examined concerning the Propper incident, since he had never been convicted or even arrested in connection with it. He relies for this argument on our statement in United States v. Semensohn, 421 F.2d 1206, 1208 (2d Cir. 1970) that

---

2. The record shows the following in this connection:

"Q. I believe that you testified on direct examination that you don't know anything about any of these acidings that you heard about; is that correct? A. That I heard about in the indictment, no.

"Q. And that you never ordered anyone to throw acid on plate glass; is that correct?

"[Defense Counsel] : I object to that, your Honor, and ask for a side bar conference in view of something that occurred before we ever impaneled the jury in this case.

"The Court: All right, come up.

[At the side bar] :

"[Defense counsel] : What Mr. Phillips is attempting to do without any shadow of a doubt, and he is attempting to do on his own, because it was not done on direct examination, he is attempting to open the door to bring in the 1960 testimony. And Mr. Propper has been sitting around this Courthouse for the last couple of days just waiting at Mr. Phillips' direction for Mr. Phillips to try and open the door. That is what he is trying to do and I object to the question which goes back to the year 1960, which your Honor specifically did not allow on my examination.

"The Court: Overruled."

3. After Glasser's denial, defense counsel asked the court "to instruct the jury at this time that they are to disregard the questions, to draw no inference from the questions; that they are bound by the answers." The court so instructed the jury.

"[i]t is settled that in a trial a witness's acts of misconduct are not admissible to impeach his credibility unless the acts resulted in the obtaining of a conviction." Even if such cross-examination were permissible, Glasser argues, Judge Motley erred in allowing the government to call Propper as a rebuttal witness and thus to make Glasser's alleged prior misconduct the subject of direct proof. Glasser cites our decision in United States v. Masino, 275 F.2d 129, 133 (2d Cir. 1960), where we stated:

> "When a witness is cross-examined for the purpose of destroying his credibility by proof of specific acts of misconduct not the subject of a conviction, the examiner must be content with the answer. The examiner may not, over objection, produce independent proof to show the falsity of such answer."

Admitting the Propper testimony here, says Glasser, was highly prejudicial for the very reasons stated by Judge Motley at the pretrial hearing.

The government responds that the Propper testimony was properly admitted in rebuttal for the purpose of impeaching Glasser's credibility, since Glasser denied ever having ordered any aciding. Moreover, according to the government, the Propper testimony should have been admitted on the government's case-in-chief as showing that on a prior occasion Glasser had planned and directed a highly unusual crime exactly the same in nature as the ones presently charged. See United States v. Deaton, 381 F.2d 114, 117 (2d Cir. 1967), and the cases cited therein. In addition, the government argues that the jury was entitled to believe that the conspiracy began earlier than 1964.

■ The question whether the Propper testimony should have been admitted on the government's case-in-chief was a matter committed to the trial court's discretion. United States v. Gardin, 382 F.2d 601, 604 (2d Cir. 1967); United States v. Palumbo, 401 F.2d 270,

273–274 (2d Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969). It is true that we stated in *Deaton* that "evidence of similar acts, including other crimes, is admissible when it is substantially relevant for a purpose other than merely to show defendant's criminal character," 381 F.2d at 117; and here the virtual identity of the parties, the means used, the ends sought, and the interests to be benefited may have made Glasser's involvement in the 1960 incident probative on the proper issue of his responsibility for the crimes charged in this indictment, rather than indicative of the improper matter of his general proclivity to crime. Nevertheless, we went on to state in *Deaton* that "the trial Judge is required, as with any potentially prejudicial evidence, to balance all of the relevant factors to determine whether the probative value of the evidence of other crimes is outweighed by its prejudicial character." 381 F.2d at 117. In the present case, Judge Motley applied this test and found that the prejudice did outweigh the probative value of Propper's testimony. In light of the discretionary nature of this type of ruling, we cannot say that Judge Motley abused her discretion in ruling out the Propper testimony on the government's case-in-chief.

■ With respect to the question of the propriety of the cross-examination, Glasser's reliance on *Semensohn* is misplaced. The defendant-witness's prior misconduct there was being used to impeach his credibility in general, whereas here it was used to impeach Glasser's credibility on a particular statement— his emphatic declaration that he had never ordered anyone to throw acid on plate glass at any time. This broad denial of guilt and sweeping assertion of good conduct was not limited to the charges in the indictment. By so testifying Glasser put his prior good conduct in issue, and the government could therefore properly cross-examine him on the earlier incident. See United States v. Colletti, 245 F.2d 781, 782 (2d Cir.), cert. denied *sub nom.* Russo v. United

States, 355 U.S. 874, 78 S.Ct. 125, 2 L.Ed. 2d 78 (1957).

There remains the question whether Propper's testimony was admissible on rebuttal to impeach Glasser's credibility. As our opinion in United States v. Masino, *supra*, demonstrates, it is settled that prior criminal acts not resulting in a conviction may not be made the subject of direct proof. See 3A Wigmore on Evidence § 979 (Chadbourn rev. 1970). The primary reason for this rule is the danger of confusing the issue of the truth of the indictment with the issue of a witness's alleged past crimes. This rule is the same when the witness is the defendant. Hence, while the questions about Propper were acceptable upon cross-examination of Glasser, the trial court erred in allowing the government to present Propper's testimony directly on rebuttal.

Nevertheless, after a careful examination of the entire record, we find that this error was harmless. Although we have sustained the trial court's ruling that Propper's testimony was not proper direct evidence, the contrary resolution of that question would also have been within the court's discretion. See United States v. Deaton, *supra*; United States v. Palumbo, *supra*. Thus the error was only in the formal label attached to Propper's testimony. Moreover, the remaining evidence of Glasser's participation in the conspiracy —especially Gellert's testimony that he had spoken to Glasser about the aciding and had overheard conversations between Glasser and Kaplan respecting certain aciding jobs—was overwhelming as to his part in the 1964–69 acidings. The effect of an error is to be gauged by "the probable impact of the [statements] on the minds of an average jury." Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1964). We believe beyond a reasonable doubt that the jury would have reached the same verdict had Propper's rebuttal testimony been admitted under the category of direct evidence.

III. Glasser next contends that he was denied a fair trial because the district judge refused to let him see a report of Propper's mental condition rendered by Dr. Cerulli, a private psychiatrist, at Propper's own request in May 1960, three months after the 1960 aciding incident, and filed with the state court at that time. Judge Motley refused Glasser access to the report because it was marked "Confidential and privileged for professional purposes only —not to be used against the patient's interest." She stated: "There is no evidence that this record was a court ordered document and the defendants concede that it was not ordered by the Court. Therefore, it appears that this is a privileged document, and unless the witness waives his privilege it cannot be used against him." Moreover, Judge Motley, after examining the report, found that it said that Propper did not have any "serious mental problem."

Glasser argues that any psychiatrist-patient privilege should be limited to disclosures made for the purpose of diagnosis or treatment and should not encompass reports, like Dr. Cerulli's, made for submission to a court; and that in any case Propper waived his privilege when he authorized its disclosure to the court. See Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398 (1955); Ramer v. United States, 411 F.2d 30 (9th Cir.), cert. denied, 396 U.S. 965, 90 S.Ct. 445, 24 L.Ed.2d 431 (1969). He argues further that he was entitled to production of Dr. Cerulli's report not only for the purpose of inquiring into Propper's mental condition, but also for the purpose of learning whether it contained a prior statement by Propper concerning the aciding incident, which was inconsistent with his trial testimony. The government responds that since trial courts have the duty to protect witnesses from needless embarrassment, Judge Motley properly exercised her discretion in withholding it from Glasser, especially when Propper himself, not the court, had asked for the examination.

■ We believe that the trial court should have permitted Glasser access to Dr. Cerulli's report; but after examining the report itself, we conclude that the error was harmless. Glasser had unfettered access to two other medical records which showed Propper's mental health to be substantially unimpaired. Dr. Francis O'Neill, a psychiatrist appointed by state court after Propper's initial plea of insanity to state aciding charges, examined him on September 6, 1960, six months after the events about which he testified, and found that he was without evidence of delusions, psychosis, major mental illness, or severe emotional disability. Moreover, records from the Veterans Administration Hospital showed that Propper's war-related anxiety neurosis, severe at the time of his discharge after he was wounded in the Second World War, was "in full remission" by 1954, six years before the events in question. Our examination of Dr. Cerulli's report reveals that it would have added little to the other two reports; as Judge Motley stated, it shows that Propper had no serious mental problems. Similarly, as impeachment material, the marginal utility of the Cerulli report was insignificant. Glasser already had Propper's confession after the 1960 incident and Dr. O'Neill's report, both of which stated that Propper had acided the window on his own whim; and Glasser utilized both of these prior inconsistent statements in cross-examining Propper. Since Dr. Cerulli's report contains an identical version of the facts, it would have been of no additional benefit to Glasser in the cross-examination of Propper.

IV. Glasser's fourth contention involves the witnesses whose prior invocation of the Fifth Amendment was elicited at trial. Following the indictment herein, but prior to trial, three union officials were subpoenaed before a federal grand jury in the Southern District of New York to testify concerning the facts of this case. Each of them claimed his Fifth Amendment privilege aginst self-incrimination.

During the trial, counsel for the defendant advised the court that the defense intended to call them as witnesses for the purpose of impeaching Gellert's credibility through proof of bias. He requested that the court direct the prosecutor not to elicit the earlier claim of privilege during cross-examination. The court explicitly found that the witnesses had been prospective defendants and had rightly claimed their privilege, and that "it would be improper to infer or permit the jury to infer from that fact that they had no such right and had something to hide." The court attempted to solve the problem by permitting the prosecutor:

> "to put this question to those witnesses, and that is whether they had testified similarly before the Grand Jury without mentioning the Fifth Amendment privilege which they later invoked."

Defense counsel immediately took exception to the court's ruling.

At trial, the prosecutor asked each of the three witnesses whether he had ever heard of the acidings; and when each replied in the affirmative, the prosecutor asked, over defendant's objection, whether he had testified the same way before the grand jury. One witness volunteered the answer "I took the Fifth Amendment." Judge Motley then instructed the jury to disregard this answer and told them the witness's refusal to answer before the grand jury was perfectly proper and that they were not to draw any unfavorable inference therefrom.[4] The other two witnesses replied that they had given no testimony at all before the grand jury. In his summation, the prosecutor referred to the witnesses' refusal to testify before the grand jury. But the court in her

---

4. She stated in full:
 "Ladies and gentlemen, this witness has testified that when he appeared before the grand jury he invoked the Fifth Amendment, which is his right not to give testimony which might tend to incriminate him.
 "Now, as you know, he had an absolute right to do that because at the time particularly he was a target of the investiga-

charge again instructed the jury that such refusal "may not count against them in your evaluation of their credibility."[5]

Glasser argues that the government's efforts to impeach defense witnesses by reference to the fact that they had claimed their Fifth Amendment privilege before the grand jury deprived Glasser of a fair trial. See Grunewald v. United States, 353 U.S. 391, 415–426, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); United States v. Tomaiolo, 249 F.2d 683, 690–692. (2d Cir 1957). Moreover, says Glasser, if the prosecution may subpoena close associates of the defendant before the grand jury, with the knowledge that they will probably invoke the Fifth Amendment, and then this may be used as a device effectively to neutralize those persons as defense witnesses at a later trial, fairness and justice would be subverted.

The government concedes that this line of cross-examination was error, but argues that that the error was harmless. According to the government, none of the three witnesses involved had the slightest significance to the defense case; the questions were asked pursuant to an advisory ruling made in advance by the trial judge; the ultimate facts which the defense sought to establish through the three witnesses were not disputed, were already in evidence, and were merely collateral; there was no possible impact on the defendant's own Fifth Amendment privilege since he tes-

tified in his own behalf; the trial judge gave prompt and adequate protective instructions when the matter first came up and again in her charge to the jury; the single question each witness had refused to answer was innocuous; and the defendant was in no way linked to their refusals.

We can see no justification whatsoever for the government's cross-examination of these three witnesses so as to elicit their prior invocation of the Fifth Amendment. Nevertheless, we agree with the government that the error was harmless. The three witnesses did not testify about aciding incidents or Glasser's role in them. Instead, their testimony went solely to Gellert's bias against Glasser. They testified that Gellert repeatedly expressed hatred of Glasser and jubilation over the fact that Glasser was being prosecuted; and they enumerated assorted wrongs which Gellert claimed had been done to him by Glasser. This testimony was cumulative on an undisputed issue. Gellert himself already had recited his grievances against Glasser and had admitted his hostility. The government expressly conceded that "of course" Gellert had a "bias" against Glasser. The government's position was that Gellert nevertheless was telling the truth; and in support of that position, the government pointed to prior consistent statements made by Gellert before the hostility arose. Since the government conceded what these three witnesses testified to —Gellert's hatred for Glasser—their tes-

---

tion, he had a right not to give any testimony against himself, so what he did was perfectly proper and you are not to draw any unfavorable inference from that statement of his with respect to his testimony here."

5. The full text of the relevant portion of Judge Motley's charge is as follows:

"Two of the Government witnesses—Propper and Gellert—invoked certain privileges in order to avoid answering certain questions put to them on cross-examination.

"I instruct you that such use of a privilege recognized by law is not to be construed adversely to these witnesses, and no unfavorable inferences may be drawn from the use of such privilege.

"The same applies to the cross-examination of certain defense witnesses who stated that they invoked their Fifth Amendment privilege against self-incrimination when they were called to testify before the grand jury.

"I further instruct you that these witnesses properly invoked their lawful privileges, and that their failure to answer certain questions, either on this trial or before the grand jury, may not count against them in your evaluation of their credibility or of the Government's case against the defendants."

timony was superfluous to the defense case and hence Glasser in all probability was not harmed by the cross-examination which was intended to impeach their credibility.

Moreover, unlike the situations in Grunewald v. United States, *supra*, and United States v. Tomaiolo, *supra*, the questions which the witnesses refused to answer before the grand jury were so remote from the crime charged that there was no possibility of a spill-over in the jury's mind linking Glasser to the witnesses' assertion of the privilege. See United States v. Sing Kee, 250 F.2d 236, 239–241 (2d Cir. 1957), cert. denied, 355 U.S. 954, 78 S.Ct. 538, 2 L.Ed. 2d 530 (1958). As we stated in *Sing Kee*, "the crucial question is whether the jury would be likely to equate [the witness'] refusal to answer these few questions before the grand jury with the defendant's guilt." 250 F.2d at 240. In this case, as in that, "the danger that the jury would believe [the defendant] to be guilty because of his association with [the witness], who had pleaded the Fifth Amendment, was minimal." *Id.* at 241.

Finally, in any event, Judge Motley's extensive protective instructions were sufficient to dispel any possibility that the jury might have been influenced to discredit the witnesses because of their prior refusal to testify. The jury was told generally and specifically that the refusals could not be the basis of any adverse inference, particularly with regard to credibility. Under all these circumstances, the error in this regard was harmless.

V. Glasser next contends that the evidence was insufficient to establish the conspiracy charged. He argues that threats are necessary to establish "extortion" within the meaning of § 1951 of

the Hobbs Act,[6] and that there was no proof of communicated threats here, either through words or actions, especially since windows installed by union shops, as well as those installed by nonunion shops, were damaged with acid. With respect to any alleged threats to the insurance companies, Glasser says that the lists of union glaziers sent to them were not threats, but merely the ordinary solicitation lists sent by unions to insurance companies in the normal course of business. Thus, according to Glasser, there was no evidence that the alleged means were in any way reasonably calculated to accomplish the desired effect. The government replies that there were threats since "actions speak louder than words"; the nonunion glaziers, insurance companies, and store owners all got the point—nonunion glass installations were likely to be damaged.

 We reject Glasser's contention. As the Supreme Court stated in American Tobacco Co. v. United States, 328 U.S. 781, 787, 66 S.Ct. 1125, 1128, 90 L.Ed. 1575 (1946), the conviction by a jury in a criminal case must be sustained if there is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt,' that the accused is guilty." See United States v. Sweig, 441 F.2d 114, 118 (2d Cir., 1971); United States v. Kahaner, 317 F.2d 459, 467–468 (2d Cir.), cert. denied *sub nom.* Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963); United States v. Lefkowitz, 284 F.2d 310, 315 (2d Cir. 1960); United States v. Skinner, 425 F.2d 552, 554 (D. C.Cir. 1970).[7] In the instant case, the evidence on Count I, the conspiracy count, was clearly sufficient to meet that test. The fact that such evidence was wholly circumstantial is irrelevant, for it is settled that the possible inference of a

---

6. 18 U.S.C. § 1951, the statute under which the indictment was drawn, defines extortion as follows:
 "(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right."

7. This Court expressed a somewhat different standard in United States v. Feinberg, 140 F.2d 592, 594 (2d Cir. 1944), where Judge Learned Hand stated that "the standard of evidence necessary to send a case to the jury is the same in both civil and criminal cases; and that, given evidence from which a reasonable person

defendant's guilt may be created either by direct evidence or by circumstantial evidence. As we stated in United States v. Bowles, 428 F.2d 592, 597 (2d Cir. 1970), "circumstantial evidence is of no less probative value than testimonial evidence. * * * The question is always whether the jury may rationally and logically infer the ultimate fact to be proved from basic facts, whether established by circumstantial or testimonial evidence, and the surrounding circumstances of the case." See also Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Aadal, 368 F.2d 962 (2d Cir. 1966), cert. denied, 386 U.S. 970, 87 S. Ct. 1161, 18 L.Ed.2d 130 (1967); United States v. Brown, 236 F.2d 403, 405 (2d Cir. 1956).

The evidence of the existence of the Hobbs Act conspiracy charged here and of Glasser's participation in it was substantial, if not overwhelming. Destruction of plate glass by acid is a highly unusual, virtually unique method; it was obviously not the casual vandalism of a passer-by. One newly installed storefront after another was thus marred, and the specific type of incident was limited almost entirely to nonunion work. This distinctive and limited kind of destruction, coupled with anonymous communications and the subsequent sending of the lists of unionized glaziers, raises the fair inference that the acidings were indeed threats from the union, for purposes of § 1951 of the Hobbs Act. Gellert's testimony, moreover, shows the existence of a conspiracy to violate that Act.

Section 1951 also requires "the obtaining of property from another." That test was met here. The insurance companies and the storeowners both suffered the direct financial harm resulting from the cost of replacing the ruined windows and paying escalated insurance premiums. The nonunion glaziers whose installations were destroyed also suffered damage, despite Glasser's argument to the contrary, for they were deprived of the right to seek future plate glass installation contracts. As we stated in United States v. Tropiano, 418 F.2d 1069 (2d Cir. 1969), cert. denied *sub nom.* Grasso v. United States, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970), "[the] right to solicit accounts * * * constitute[s] property within the Hobbs Act definition."

Glasser's part in the conspiracy was revealed, albeit circumstantially, through his admitted requests for reports of nonunion activity, through his mailing of the union lists with a covering letter signed by him, and—primarily —through Gellert's testimony as to his participation. Finally, there was ample proof that the conspiracy benefited the union and particularly Glasser. In almost every instance where a nonunion installation was destroyed, the replacement work was done by union companies, often those owned by Glasser's relatives. There was thus more work for members of the union, and more business for Glasser's family companies. All this was surely enough for the jury to infer beyond a reasonable doubt that the acidings constituted threats by the union, that a conspiracy to extort existed,

might conclude that the charge in an indictment was proved, the court will look no further, the jury must decide, and the accused must be content with the instruction that before finding him guilty they must exclude all reasonable doubt." We are convinced, however, that the standard set forth in the text is the correct one. See, in addition to the cases cited in the text, United States v. Masiello, 235 F.2d 279, 286, 291 (2d Cir.) (Frank, J., concurring), cert. denied sub nom. Stickel v. United States, 352 U.S. 882, 77 S.Ct.

100, 1 L.Ed.2d 79 (1956); United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961), cert. denied, 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962); United States v. Leitner, 202 F.Supp. 688 (S.D. N.Y.1962), aff'd per curiam, 312 F.2d 107 (2d Cir. 1963); United States v. Melillo, 275 F.Supp. 314 (E.D.N.Y. 1967); United States v. Chas. Pfizer & Co., 281 F.Supp. 837 (S.D.N.Y.1968). See also United States v. Conti, 339 F.2d 10, 13 (6th Cir. 1964); Riggs v. United States, 280 F.2d 949 (5th Cir. 1960).

and that Glasser played an integral role in that conspiracy.[8]

 VI. Finally, Glasser contends that the evidence was insufficient to establish his guilt on Counts II and III— the substantive violations of § 1951. Count II charged the defendants with aciding the windows of Chemical Bank New York Trust Company on July 14, 1967. The only evidence to support this count was as follows; Benjamin Shepherd, a real estate agent, testified that in July, 1967, he arranged to have the window frames of the Chemical Bank repaired. This involved the temporary removal of the glass and then the replacement of the same glass. The work was done by Aachen Window Corporation, a nonunion shop which primarily does ironwork; it is not a glazier company. During the following weekend, the glass was vandalized by acid.

Count III charged the defendants with aciding the windows of American Labor-Temp Service on September 10, 1967. The sole evidence supporting this count was testimony by Leo Durocher, the manager of American Labor-Temp, that as part of their building renovation, new glass was installed; that he did not remember the name of the glazier who did the installation; that on the day after the installation, the glass was vandalized by acid; that at that time his assistant found the note, described above, to the effect that when the glass was replaced, he was to make sure it was union glass; and that he hired a union glazier to do the replacement.

Glasser argues that there was no evidence to connect him with these incidents, and hence that the court should have granted his motion to dismiss these two counts. The government responds that although the evidence was circumstantial, it was substantial enough to support the jury's verdict—that Glasser was responsible for the two acidings in question. The government argues that since Glasser was clearly in the center of the conspiracy to intimidate glaziers through aciding their installations, the jury could well have inferred that he was responsible for these particular acidings.

We disagree with the government on this issue. There was simply not enough evidence to connect Glasser with either of the two acidings which constituted Counts II and III of the indictment. With respect to Count II, since the acidizing substance was available to anyone who wished to purchase it, the vandalism could have been performed by anyone—steel workers angered at the use of nonunion steel workers, competitors of Aachen Window, or someone with a grievance against the Chemical Bank. The speculative nature of the source of the aciding is increased by the fact that Aachen Window is a nonunion ironworker, not a glazier, and its competitors are unionized ironworkers. Thus,

8. Glasser raises another claim of error— that the evidence was insufficient to show the requisite interference with interstate commerce and hence that there was no federal jurisdiction. He contends that the glass used by the nonunion glaziers was not in interstate commerce because they acquired it from local distributors. He also claims that the effect of his systematic destruction of plate glass store fronts was to enhance commerce rather than to obstruct or delay it, since each ruined window was replaced, thus doubling glass imports for the installations involved and increasing the total volume of commerce in glass.

We reject these contentions. The actual and natural effect of Glasser's alleged activities was to diminish purchases of glass by nonunion glaziers; and since Glasser concedes that all the glass which they used came originally from outside the state, the deleterious effect on interstate commerce is obvious. See United States v. Tropiano, 418 F.2d 1069, 1076 (2d Cir. 1969), cert. denied *sub nom.* Grasso v. United States, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970); United v. Varlack, 225 F.2d 665, 672 (2d Cir. 1955); Battaglia v. United States, 383 F.2d 303, 305–306 (9th Cir. 1967), cert. denied, 390 U.S. 907, 88 S.Ct. 817, 19 L.Ed.2d 874 (1968). Glasser's latter argument is facetious and frivolous.

the jury's verdict, which found Glasser guilty on this count, was not supported by any evidence of Glasser's complicity.

Count III was defective in proof for the same reasons. The anonymous note, not produced at trial, can hardly be called proof of guilt. The union itself had over eight hundred members, and evidence received at trial revealed that at least two of those members—Gellert and Hill—had on at least one occasion each taken it upon himself to acidize glass without any instruction or directive and without any conspiratorial intent.

All that was established on these two counts was that the glass was vandalized and on one occasion a note found. We cannot see how this evidence could have led the jury to find or infer beyond a reasonable doubt that Glasser was guilty of the two acidings in question. Since the evidence was thus insufficient to support a verdict against Glasser on Counts II and III, his conviction on those two counts must be reversed.

Affirmed as to Count I; reversed as to Counts II and III.

Heaney, Circuit Judge, concurred in the result and filed an opinion.