**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Bernard G. RUBIN, Defendant-Appellant.**

**No. 76–1143.**

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1977.

Rehearing and Rehearing En Banc Denied Nov. 2, 1977.

---

**15.** See note 5, *supra*.

Richard L. Rosenfield, Los Angeles, Cal., for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Ivan Michael Schaeffer, Atty., T. George Gilinsky, Dept. of Justice, Washington, D. C., Jerome M. Feit, Atty., Marty Steinberg, Sp. Atty., Dept. of Justice, Miami, Fla., for plaintiff-appellee.

Before GOLDBERG and HILL, Circuit Judges and KERR *, District Judge.

GOLDBERG, Circuit Judge:

Bernard G. Rubin appeals from his conviction of charges relating to his role in the financial operations of several southern Florida laborers' organizations. Appellant is a Special International Representative of the Laborers' International Union of North America. He is President of the Southwest Florida Laborers' District Council (hereinafter "District Council"), an umbrella organization supervising several locals. He is President of the Concrete Products & Material Yard Workers Local # 666, Business Manager of Local # 478, and a trustee of several labor trust funds.

Following a two week trial a jury found appellant guilty on 103 counts of the 105 count indictment charging embezzlement of union and employee welfare benefit plan funds, 29 U.S.C. § 501(c), 18 U.S.C. § 664; racketeering, 18 U.S.C. § 1962(c); false statements on income tax returns, 26 U.S.C. § 7206(1); and failure to keep labor union records, 29 U.S.C. §§ 436, 439. The court imposed concurrent sentences on all counts up to a maximum of five years imprisonment. The court levied fines totalling $50,-000.00 on five different counts. Finally, the court ordered appellant to forfeit all his union and trust fund positions as well as his right to seek such positions in the future.

Eighty-six counts of the indictment charged appellant with embezzling funds from the various unions and trust funds by submitting to those entities duplicate expense vouchers, mostly for travel and entertainment, thereby receiving multiple reimbursements for expenses incurred. With respect to each expense covered by the indictment, appellant had sent a voucher to each of two or more of the organizations and received reimbursement. The government credited one reimbursement of each expense as legitimate, charging embezzlement only on the duplications. Appellant

* Senior District Judge of the District of Wyoming, sitting by designation.

did not deny the fact of these many multiple reimbursements. Rather, he maintained that he employed the duplicate billing system to create a cash fund he needed for additional union related expenses. Rubin asserted that he had understood his power of the purse in the various organizations to encompass accumulating such a fund and making such expenditures. Numerous defense witnesses testified that he had spent large amounts of cash in past organizing drives and in entertaining management.

Additionally, the indictment charged appellant with two counts of embezzlement through granting himself over $300,000 in unauthorized salary increases as an officer of local 666 and the District Council. The charges of inadequate recordkeeping largely related to required documentation of union treasury disbursements. The tax counts charged false subscribing of income tax returns, in that appellant received substantial income in excess of the amount reported. Finally, on the basis of the embezzlement allegations appellant was charged with conducting or participating in the conduct of the union organizations through a pattern of racketeering activity.

On appeal Rubin proffers several claims of error. We agree with appellant's contention that two of his defense witnesses should not have been cross-examined regarding their prior refusals to testify before a grand jury, but we find the error harmless in the circumstances. We reject appellant's remaining claims of error in the conviction. Finally, though we think the district court properly ordered Rubin to forfeit the positions he presently holds, we must reverse its order that he forfeit his right to seek such offices in the future.

I. Defense Witnesses' Silence Before the Grand Jury

Appellant's most troubling challenge to the validity of the conviction relates to the government's attempt to impeach two defense witnesses by eliciting on cross-examination their prior refusals to testify before a grand jury. We conclude that the trial court violated evidentiary canons by permitting such impeachment.

In light of the cumulative nature of the witnesses' testimony, the substantial proper impeachment of these and all other defense witnesses, and the inherent implausibility of appellant's defense theory, however, we cannot conclude that the error here requires reversal.

Kenton Wells, an organizer for the District Council, and Jack Gordon, an organizer for the District Council and local 666, were two of eight witnesses who corroborated appellant's story that during the relevant years he had handed out large amounts of cash to subordinates for use in organizing campaigns and had spent large amounts of cash entertaining management figures. Appellant testified these expenditures required a large cash fund which he maintained through the multiple billing of the various union entities for yet other expenses. Rubin claimed he had understood that accumulating funds in this manner and disbursing them for general organizing purposes fell within the authority granted him by the District Council and local 666. The defense witnesses, Wells and Gordon among them, corroborated only the fact of numerous disbursements for organizing and entertaining. They gave no testimony regarding the source of Rubin's funds.

In an effort to impeach the testimony of Wells and Gordon through proof of a prior inconsistent act, the prosecution brought out on cross-examination the witnesses' previous refusals to testify before the federal grand jury investigating the activities of southern Florida laborers' organizations. Of Wells the government inquired as follows:

Q. Without respect to the exact date, sir, did you appear twice before the Federal Grand Jury?

A. Yes, sir.

Q. Were you asked questions concerning your labor-union activities and Mr. Rubin?

A. Yes, sir.

Q. Did you refuse to testify on both of those occasions?

A. Yes, sir, I did. (T. 1522–23).

At one time during the colloquy, set out in its entirety in the margin,[1] Wells volunteered that he "had taken the Fifth Amendment." (T. 1521). Similarly, the following exchange took place during the cross-examination of Jack Gordon:

Q. Mr. Gordon, did you appear at the Federal Grand Jury on May 27, 1975?

---

[1]. Q. Mr. Wells, I notice that Mr. Flax asked you your occupation.

A. Yes, sir.

Q. Have you ever given a different response on a previous occasion?

A. Not that I know of as far as my occupation. No, I don't.

Q. Do you remember testifying to a Federal Grand Jury on April 29, 1975?

MR. ROSENFIELD: Can I have a copy of that, Counsel?

MR. STEINBERG: I don't have extra copies, Mr. Rosenfield.

A. Yes, I do, 1975.

MR. ROSENFIELD: Before he inquires, I would like an opportunity to take a look at the document.

MR. STEINBERG: It's not part of discovery, Your Honor. I only have one copy. It's not discovery.

THE COURT: Let him look over your shoulder or read what you are reading.

MR. ROSENFIELD: That is fine.

I object to the characterization as not being discoverable. It is now discoverable.

BY MR. STEINBERG:

Q. Did you ever give a different response on a previous occasion, Mr. Wells?

A. Not that I know of, sir.

Q. Did you testify in the Federal Grand Jury on April 29, 1975, sir?

A. This year?

Q. That's correct.

A. No, sir, I didn't.

Q. You did not?

A. I came before the Federal Grand Jury.

Q. Were you asked this question:

"Q. What is your occupation?"

A. I was asked that question.

Q. Did you give the same response that you gave to Mr. Flax?

A. I gave my address at that time, sir, 836 West Drive.

Q. After you gave your address, were you asked your occupation?

A. Yes.

Q. Did you give the same response that you gave Mr. Flax?

A. No, sir. I took the Fifth Amendment.

MR. FLAX: May we approach the bench, Your Honor?

THE COURT: Come right up.

(Side-bar conference:)

MR. ROSENFIELD: Your Honor, I would suggest that because the man answered the question before the grand jury that he refused to answer on the ground that it might tend to incriminate him, this would be improper and highly prejudicial. There is nothing inconsistent about a witness' trying to invoke the Fifth Amendment in front of a grand jury and testifying here. There is nothing inconsistent about that at all. This kind of questioning is improper.

I would suggest that before counsel be allowed to interrogate him with respect to that document, that I be allowed to take a look at it.

THE COURT: I have overruled your objection. You can certainly bring out that he refused to testify before the grand jury. I think that is proper cross-examination.

I do not think we need fifty questions to do it. If he refused to answer all the questions, I think we can bring that out and then drop it.

MR. STEINBERG: Fine.

(Side-bar conference concluded.)

BY MR. STEINBERG:

Q. Mr. Wells, were you called to testify before the Federal Grand Jury on two occasions, October 29, 1974, and April 29, 1975?

A. Sir, I could not possibly swear to that because I don't have anything at all to tell me what time that I went up there. You could ask me a question of that nature and I can't tell you exactly what date or when those specifics took place.

Q. Without respect to the exact date, sir, did you appear twice before the Federal Grand Jury?

A. Yes, sir.

Q. Were you asked questions concerning your labor-union activities and Mr. Rubin?

A. Yes, sir.

Q. Did you refuse to testify on both of those occasions?

A. Yes, sir, I did.

Q. Mr. Wells, during any of those occasions did you tell the grand jury or the Government about this fund of cash that you were receiving?

MR. ROSENFIELD: I will object to that, Your Honor. He testified he has not testified before. Any other question he would be incompetent to answer. He said he did not testify.

THE COURT: I think this question has two parts and I will sustain the objection. I think he has answered that part dealing with the grand jury. I am not so sure he answered the part dealing with the Government, if that means someone other than the grand jury.

THE WITNESS: Would you repeat the question, sir.

BY MR. STEINBERG:

Q. Mr. Wells, I will rephrase the question. Have you ever told the Government before about this cash that you were receiving from Mr. Rubin to organize?

A. I don't recall telling the Government anything, sir. (T. 1519–24).

A. I don't remember the date. I appeared there, yes, at the grand jury.

Q. Did you ever refuse to testify?

A. Yes, I did. (T. 1622–23).

The trial court overruled defense counsel's objections to both these lines of inquiry. As part of his discussion of the defendant's case during closing argument, the prosecutor commented on the testimony of Wells and Gordon, plainly stating that he saw a contradiction between their corroboration of appellant's exculpatory story and their refusals to speak to the grand jury.

## A. Improper Impeachment Under Evidentiary Guidelines

Appellant asserts that admission of the witnesses' silence before the grand jury, exacerbated by the prosecutor's reference during argument, was error. We agree that under well-established evidentiary principles the impeachment was improper.

### 1. The Requirement of Inconsistency Between Silence and Testimony

In *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975), the Supreme Court reiterated the governing principles:

> A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness. As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent. 3A J. Wigmore, Evidence § 1040 (Chadbourne rev. 1970). If the Government fails to establish a threshold inconsistency between silence . . . and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded.

*See also Grunewald v. United States*, 353 U.S. 391, 418–19, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). In *Hale*, the Court concluded that a defendant's silence in the circumstances following arrest and *Miranda* warnings lacked the requisite inconsistency with his exculpatory trial testimony and that such silence was therefore inadmissible for impeachment purposes. More recently the Court has held that the impeachment use of a defendant's post-arrest, post-*Miranda* warning silence violated the due process clause. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

For present purposes we limit our analysis to the evidentiary framework employed in *Hale*. Into that framework we must place, not a defendant, but a defense witness and, not the circumstances of a post-arrest police interrogation, but those of the grand jury room. The question before us is whether the prior silence of a defense witness before the grand jury conveys the threshold inconsistency with the witness's exculpatory trial testimony that is necessary to permit the use of the silence to impeach the testimony. We hold that it does not.

### 2. Silence and the Grand Jury

*Grunewald v. United States, supra*, precludes any suggestion that silence before the grand jury is more probative than silence following arrest. In the circumstances of *Grunewald*, the Supreme Court squarely rejected the argument that the defendant's invocation of the privilege against self-incrimination before the grand jury had "involved such inconsistency with any of his trial testimony as to permit its use against him for impeachment purposes." 353 U.S. at 419, 77 S.Ct. at 981.

To reach that conclusion the Court placed significant reliance on factors always attendant upon appearing before a grand jury:

> [T]he Fifth Amendment claim was made before a grand jury where [defendant] was a compelled, and not a voluntary, witness; where he was not represented by counsel; where he could summon no witnesses; and where he had no opportunity to cross-examine witnesses testifying against him. These factors are crucial in weighing whether a plea of the privilege is inconsistent with later exculpatory testimony on the same questions, for the nature of the tribunal which subjects the witness to questioning bears heavily on

what inferences can be drawn from a plea of the Fifth Amendment. Innocent men are more likely to plead the privilege in secret proceedings, where they testify without advice of counsel and without opportunity for cross-examination, than in open court proceedings, where cross-examination and judicially supervised procedure provide safeguards for the establishing of the whole, as against the possibility of merely partial, truth.

*Id.* at 422–23, 77 S.Ct. at 983 (citation omitted).

The Court also emphasized that the grand jury had considered the defendant a potential target for indictment at the time of his appearance. Therefore "it was quite natural for him to fear that he was being asked questions for the very purpose of providing evidence against himself," and "quite consistent with innocence for him to refuse to provide evidence which could be used by the Government in building its incriminating chain." *Id.* at 423, 77 S.Ct. at 983.

Both the general nature of grand jury proceedings and the particular situation of the defendant thus fed the Court's conclusion that his invocation of the privilege had been "wholly consistent with innocence" and consequently inadmissible to impeach the defendant's exculpatory trial testimony. *See id.* at 421–22, 77 S.Ct. 963. Given the risk that the jury had drawn an inference of guilt from the exercise of the privilege, the Court found the error in admitting the evidence for impeachment purposes prejudicial. *See, id.* at 423–24, 77 S.Ct. 963.

When Wells and Gordon appeared before the grand jury investigating the laborers' unions of southern Florida, they faced the same uncertainties and pressures that *Grunewald* found inherent in the grand jury's secret *ex parte* proceedings. Insofar as the record reveals, the two witnesses also could have been justified in the conclusion that they were being interrogated for the express purpose of supplying evidence against themselves. They of course could invoke the privilege properly only to avoid incriminating themselves; the government has never levied the charge that either improperly claimed the protection of the fifth amendment.

The government bears the burden of establishing the threshold inconsistency necessary to admit impeachment evidence. *See United States v. Hale, supra*, 95 S.Ct. at 2136. So long as a grand jury witness has properly invoked the privilege against self-incrimination, the "insoluble ambiguity" of his silence, *see Doyle, supra*, 96 S.Ct. at 2244, precludes demonstration of that requisite inconsistency. Accordingly, the predicate for impeachment use of Wells' and Gordon's grand jury silence was lacking.

### 3. *Prior Silence of a Defense Witness*

■ That we are concerned with the testimony of defense witnesses, rather than a defendant, neither renders inapplicable the requirement of threshold inconsistency nor provides any additional basis for concluding that the requirement was here met. The Eighth Circuit has squarely applied *Grunewald* in the witness context. *See United States v. Williams*, 464 F.2d 927 (8th Cir. 1972). Drawing on *Grunewald's* description of the nature of grand jury proceedings, the court in *Williams* rejected the argument that the refusal of a defense witness to testify before a grand jury was inconsistent with his trial corroboration of the defendant's exculpatory story. The court concluded that the improper impeachment had been prejudicial where the single defense witness's corroboration had been critical, and it reversed the conviction. Similarly, the Second Circuit has stated that where a witness, who is later to supply exculpatory testimony for a criminal defendant, has a reasonable belief at the time of a grand jury appearance that he may be a defendant himself,

. . . it is perfectly consistent with innocence and with nonincriminatory answers to particular questions to refuse to answer any question at all.

*United States v. Tomaiolo*, 249 F.2d 683, 691 (2d Cir. 1957).

*See also United States v. Natale*, 526 F.2d 1160 (2d Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976);

*United States v. Glasser,* 448 F.2d 994, 1004–06 (2d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).[2]

The conclusion of these two courts that a defense witness's prior silence before a grand jury and trial testimony exculpating the defendant lack sufficient inconsistency to justify impeachment use of the silence is well-founded. *Grunewald* teaches that the many factors that may lead an individual to remain silent before the grand jury make it impossible to draw any reasonable inference that a subsequent protestation of his own innocence has been fabricated. Assuming a reasonable belief at the time of the witness's grand jury appearance that he himself may be a defendant, any suggestion of inconsistency between his silence and subsequent testimony exculpatory of someone else can certainly be no stronger.

### 4. The Potential for Prejudice

As against the complete lack of probative value in the defense witness's refusal to testify before the grand jury, impeachment by that silence runs some risk of two varieties of prejudice. First, where the jury learns that the witness's silence was an exercise of the privilege against self-incrimination, there is a danger the jury will improperly infer guilt on the part of the witness and, depending on the circumstances, transfer that inference to the defendant. *See United States v. Natale, supra; United*

2. *Natale* and *Glasser* are concerned more directly with the prejudicial impact of explicit attempts to elicit from a defense witness the fact that he previously exercised the fifth amendment privilege, rather than the lack of probative impeachment value in a witness's prior silence. Therefore these cases do not explore the issue of consistency between grand jury silence and exculpatory trial testimony. The opinions do cite *Williams* and *Tomaiolo* with approval, however, and they make clear that a defense witness's prior silence before a grand jury is not a proper subject of cross-examination in the Second Circuit.

3. In a similar vein the D.C. Circuit has held that a prosecutor cannot attempt to impeach a defense witness by eliciting on cross-examination that the witness had not testified at the defendant's preliminary hearing. *See United States v. Huff,* 143 U.S.App.D.C. 163, 442 F.2d 885 (1971). Given the many reasons for the

*States v. Glasser, supra.* Second, without an understanding of the uncertainties a witness faces in testifying before a grand jury, a juror may well attribute undue significance to the fact a witness offered no response to the prosecutor's questions before that tribunal and may thereupon disbelieve the witness's trial testimony. To allay any such tendency would require the defense somehow to instruct the petit jury on the difficulties of testifying before a grand jury, an abstract digression that would at best distract the jurors and at worst unduly emphasize the issue of silence, exacerbating any tendency to draw the improper substantive inference that the witness was hiding guilt that may taint the defendant.[3]

■ A defense witness's prior refusal to supply testimony to a grand jury before which he had a reasonable belief that he might be a defendant himself has no proper significance as impeachment evidence. Use of the evidence for that purpose risks prejudice. Accordingly, we hold that the government may not attempt to impeach a defense witness by eliciting such a prior refusal to testify before a grand jury.[4]

### B. The Constitution Inviolate

■ Appellant argues that the impeachment use of the prior silence of Wells and Gordon not only violated the rules of evidence, but also transgressed constitutional boundaries staked out in *Doyle v. Ohio,*

defense not to put on evidence at such a hearing, the court found the witness's failure to testify there of little if any probative value. The court also recognized that a jury might tend to find significance in the failure to testify. Rather than require defense counsel to combat that prejudicial tendency with a demonstration of the general nature of preliminary hearings and the particular considerations that governed the hearing in question, the court prohibited the impeachment use of a witness's failure to testify at a preliminary hearing.

4. This holding of course does not apply to the type of situation discussed in *United States v. Fairchild,* 505 F.2d 1378 (5th Cir. 1975), and noted in *Doyle v. Ohio, supra,* 96 S.Ct. at 2245 n. 11, in which the defendant (here, a defense witness) has conveyed the impression that he affirmatively cooperated with the government in all matters relating to the case.

*supra. Doyle* did elevate to a constitutional level the Court's earlier holding that impeachment use of a defendant's post-arrest, post-*Miranda* warning silence was improper as an evidentiary matter. *See United States v. Hale, supra.* Because we find that the Court's reasons for being party to that particular ascension do not transfer to the situation before us, we reject appellant's claim of constitutional error.

Certainly the *Doyle* Court reaffirmed the recognition in *Hale* of the inherent ambiguity of post-arrest silence. However, the Court expressly noted that its consideration of the lack of probative value of the Ohio defendants' silence was unnecessary to its constitutional holding. *Id.* 96 S.Ct. at 2444–45 n. 8. Rather, that holding followed from the fundamental unfairness of employing a person's invocation of the right against self-incrimination to his disadvantage as he stands trial.

Justice Powell's majority opinion described that unfairness in the context presented by *Doyle* of post-*Miranda* warning silence:

> . . . while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* 96 S.Ct. at 2245.[5]

That same unfairness may be present whenever the government attempts to exploit a proper invocation of the privilege, whether or not preceded by explicit warnings of the right to remain silent. Thus, whatever the ultimate validity of the proposition that *Miranda*-type warnings are required in the grand jury room, *see United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977); *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), the factors found constitutionally intolerable in *Doyle* might be thought to extend to a defendant's silence in the face of grand jury questioning.

We need not resolve this question today. A defendant cannot complain where the prosecutorial abuse is of *another's* exercise of the constitutional privilege against self-incrimination.[6] That privilege is a personal one. It is established that a defendant may not object to the violation of another person's privilege. *See Doyle, supra*, 96 S.Ct. at 2248 (Stevens, J., dissenting) and cases cited. Thus a defendant cannot complain of any *Doyle*-type unfairness that might be seen in impeachment of a defense witness by a prior refusal to testify before a grand jury.[7]

## C. Error Harmless

▮ Because we have found the error in impeaching Wells and Gordon by their grand jury silence to be nonconstitutional, the strict guidelines set out in *Chapman v. United States*, 547 F.2d 1240, 1249–50 (5th

---

5. The Court went on to quote with approval from Justice White's concurrence in the judgment in *United States v. Hale, supra*, 95 S.Ct. at 2139. "Surely *Hale* was not informed here that his silence, as well as his words, could be used against him at trial." *Doyle, supra*, 96 S.Ct. at 2245.

6. *Doyle* itself specifically reserved the question whether constitutional error would obtain upon the use of post-arrest, post-*Miranda* warning silence to impeach a defense witness rather than the defendant.

7. Note that in *Unted States v. Sobell*, 314 F.2d 314 (2d Cir. 1963), the court opined that on the assumption the *Grunewald* holding achieved constitutional dimensions, those constitutional implications would be limited to the person whose claim of the privilege was used against him.

Beyond the unfairness of exploiting a claim of the privilege, we cannot conclude that the grand jury silence of a defense witness is so utterly lacking in probative value yet highly charged with prejudicial potential that its use merits universal constitutional condemnation. We need not forecast whether the use of such evidence might in some particular case be so critically prejudicial as to rise to the level of a due process violation. The case at bar, however, is not such a case.

Cir. 1977), for testing the harmlessness beyond a reasonable doubt of a *Doyle* violation are inapplicable. Rather we must apply the test of *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946):

> . . . if [we] cannot say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*See United States v. Constant,* 501 F.2d 1284, 1289 (5th Cir. 1974), *cert. denied,* 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975).[8]

 Oft times the alleged heinousness of a crime provides the judicial vehicle for a finding of harmless error. That factor, however, is never an appropriate consideration. Here, in reading and examining the record, we have attempted to strain out the quality of the alleged crime and to confine our attention to the residue of its basic factual underpinnings. The nature of the crime has not entered our evaluation of the evidence, which we find to be overwhelmingly convictive. Cognizant that "harmless-error rules can work very unfair and mischievous results", *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), we are nevertheless convinced that the improper impeachment of Wells and Gordon tainted appellant's trial at most to such a marginal extent that the judgment must be affirmed under the above standard.

The government presented an extremely powerful, if circumstantial, case against the appellant. Largely unchallenged documentary evidence established that appellant made it a common practice to bill identical expenses, chiefly travel and entertainment, to each of local 666, local 478, the District Council, and the ILU, and to obtain full reimbursement from each. The vast majority of the reimbursement checks were cashed by Rubin at a savings and loan association; a few were deposited in an account Rubin maintained there. Similar documentation established that when attending a conference on behalf of the various employee welfare benefit plans of which he was a trustee, Rubin would obtain from each organization the amount it had set to cover an individual's full expenses at the conference.

None of the entities to which appellant addressed his duplicate billing had any notice of his reimbursement from other sources. Indeed, the government established that in local 666, the constitution of which required two signatures on all checks from the union treasury, Secretary-Treasurer Henry signed all checks in blank. Appellant, president and business manager of 666, supplied the payee and amount.

Appellant did not deny the fact of multiple billing. Rather, he attempted to show that his actions were unaccompanied by the intent requisite to convictions under 29 U.S.C. § 501(c).[9] Rubin claimed that organizing drives and the maintenance of relationships with management required him to keep a large cash fund at the ready. He testified that in a campaign to unionize laborers at a particular plant, he had frequently had to give a subordinate organizer as much as several thousand dollars cash to compensate workers helping in the drive and to entertain others. Checks were too slow and cumbersome in the brief duration

---

8. *Kotteakos* continues to provide the standard for judging nonconstitutional errors in this circuit. *See, e. g., United States v. Martinez,* 536 F.2d 1107 (5th Cir. 1976); *United States v. Jennings,* 527 F.2d 862 (5th Cir. 1976); *United States v. Harbolt,* 491 F.2d 78 (5th Cir. 1974); *United States v. Resnick,* 488 F.2d 1165 (5th Cir. 1974).

9. On the contents of that intent requirement, *see United States v. Ottley,* 509 F.2d 667 (2d Cir. 1975); *United States v. Silverman,* 430 F.2d 106 (2d Cir. 1970).

of a campaign; laborers traditionally preferred cash. Cash would frequently be required by the establishment at which, over lunch or a drink, prospective members were encouraged to join. Cash was sometimes necessary to cover workers' emergency needs during a strike. Finally, cash was an important part of appellant's efforts to entertain management. Rubin testified of the importance of maintaining an "image of affluence." He related that he attempted always to carry four or five thousand dollars in cash, with which he could pick up large bills.

Appellant explained that he had employed the multiple billing practice to generate this cash. He testified that local 666 and the District Council had authorized him to make whatever expenditures from the union treasury he deemed in the interest of the organization. He had concluded that this authorization legitimized the multiple billing and the use of the cash fund for general organizing and maintenance of relations with management. As for the employee welfare benefit plans, Rubin testified that a lawyer had advised him that it was legal to receive conference expense advances from more than one entity, so long as any excess over actual expenses was spent on union business.

On cross-examination, Rubin testified that he maintained no records of the cash fund or disbursements from it. Moreover, the government's evidence contained material responsive to appellant's story. The annual reports of each relevant entity, required by the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401–531, showed the amount of expenses that entity had reimbursed, but the cash fund and the disbursements from it never appeared. The government introduced evidence tending to show that an audit of any individual organization involved would not have disclosed the multiple reimbursements. Finally, the government documented a multitude of expenditures not included in the indictment that appellant had not covered out of any cash fund, but for which he had, instead, received reimbursement.

Suffice it to say that after appellant told his story the government's case remained extremely strong. According to his own testimony, appellant had the legitimate authority to draw a check on one of the union treasuries whenever organizing or entertaining expenses created the need for cash. Instead he generated cash by copying assorted bills and charging them two to four times over to various entities.

The witnesses called by appellant corroborated only one aspect of his story: the fact of numerous and large cash expenditures by Rubin, either as disbursements to subordinates for organizing or as payments by himself in entertaining. Including Wells and Gordon, eight witnesses testified to this effect, six from the union ranks and two contractors.

Larry Feder, an organizer for local 666, was perhaps the chief union witness. He testified that over the relevant years he had received between $35,000 and $40,000 cash from Rubin for organizing expenses. Additionally, he had witnessed Rubin spend large amounts of cash at dinners with management.

The government attacked Feder's credibility in numerous ways. As with all the organizers who testified, the government established the large salary received by Feder at appellant's direction. Feder admitted he had kept no records of any of the thousands of dollars he claimed to have received. Most importantly, the government offered the testimony of Department of Labor Agent William Gamble, who had interrogated Feder regarding the money he received as an organizer, specifically inquiring how his expenses were paid. Feder had told Gamble that expenses were reimbursed upon the submission of receipts. No mention was made of ever receiving cash from appellant. The prosecutor repeatedly emphasized Feder's statement to Gamble in his closing argument.

Jake Wright, a district council organizer, offered similar testimony, accounting for approximately $6,000 cash received from appellant. On cross-examination, Wright first testified that he thought he had told

Agent Gamble about the cash payment in response to questions Gamble asked about organizing expenses. A review of his statement to Gamble refreshed his recollection to the contrary. Moreover, the government brought out Wright's grand jury testimony that he did not know what Rubin did in his union offices. Again, the prosecutor emphasized this impeachment material in argument.

Besides Wells and Gordon, the defense called two other union witnesses of relatively minor importance. A laborer from local 478 testified that he had received $2400 cash from appellant for work in an organizing campaign. A shop steward from local 478 testified that he had received $1,000 cash from Jake Wright in each of two campaigns.

Wells and Gordon each accounted for around $13,000 cash received from Rubin for organizing expenses, though Wells testified at greater length and in more detail. Apart from any effect of the impeachment by grand jury silence, Wells's testimony at many points lacked credibility in its own right. On direct he attempted to explain the absence of receipts for his organizing expense. Wells testified that when an organizer takes a recruit out to lunch, he cannot impress the prospect if he has to obtain a receipt. Wells further testified that he did sometimes manage to collect receipts, but that these were frequently lost when his wife washed his clothes. The prosecutor pointed to Wells's lack of credibility as well as his grand jury silence in argument. Apart from Gordon's grand jury silence, the government attacked his testimony only as it did that of each organizer—with the facts that appellant controlled his salary and that Gordon had kept no records of the cash he received from Rubin.

In short, the defense put on four union witnesses of significance in the effort to corroborate the fact of union related cash expenditures by appellant. With the possible exception of Gordon, who testified most briefly of the four, each faced sharp attack from the government apart from the impeachment use of Wells's and Gordon's grand jury silence. The prosecutor emphasized those attacks in closing argument at least as forcefully as the references to the silence of Wells and Gordon.[10]

■ The jury's verdict rests on either of two lines of reasoning. Given the strength of the government's case, the jury could well have believed the defense witnesses' testimony that Rubin made many large cash payments related to union activities and still have concluded that Rubin knew the multiple reimbursements were unauthorized or that the multiple reimbursements were unrelated to any such cash payments, sufficient for them to find violations of 29 U.S.C. § 501(c). That Rubin was a good union man is no defense to the requirement of a modicum of accountability for moneys expended for the union. The embezzlement statute imposes no penny pinching requirements, but neither does it afford blanket exculpation for open-handedness and benignity in the spending process. The jury could easily have concluded that union activities require big spending and that Rubin was a free spender, but still have believed that he knew accumulating funds by duplicate billing was unauthorized and that the funds so accumulated were not benignly employed. In that case the improper impeachment obviously had no impact.

Alternatively, the jury may have disbelieved all or part of the testimony regarding Rubin's cash expenditures. We find nothing in the cross-examination or argument regarding the grand jury silence of Gordon and Wells that would have any significant tendency to impugn the testimony of Feder and Wright. To the extent the jury disbelieved the latter pair, we are confident they

10. We reject the claim that the prosecution's argument tended to lump all the defense witnesses under the refusal of Wells and Gordon to testify. When read in context, each of the references to their grand jury silence is accompanied by distinct references to the statements given to Agent Gamble by Feder and Wright that were inconsistent with their trial testimony and to Wright's inconsistent statement to the grand jury.

did so on the basis of the substantial proper impeachment of the two.

Thus it appears that at most the improper impeachment tended to discredit Gordon's brief comments and Wells's testimony, not without substantial independent implausibility. The effect of that tendency must have been slight. There was no defensive attempt to match the total allegedly embezzled sums to the expenditures related by the witnesses. Each individual witness did not occupy a linchpin position. Thus the possibility that the jury believed Feder and Wright but rejected the defense because of the improper impeachment of Gordon and Wells is remote. Moreover, given the sum of Gordon's and Wells's testimony, the possibility is equally slim that the jury disbelieved the remaining defense witnesses but would have accepted the defense absent the improper impeachment. In light of the balance of the evidence and the place of Wells and Gordon in the defensive lineup, we cannot conclude that the erroneous impeachment use of their refusal to testify before the grand jury was prejudicial under the *Kotteakos* standard.[11] Were that balance any different or the testimony of Wells and Gordon of any more apparent importance, different considerations would obtain. As this record stands, however, we harbor nothing approaching a "grave doubt" that the error did not exert a substantial influence on the jury. We think it clear that the error was harmless.

## II. Other Claims

We may readily dispose of appellant's remaining attacks on the validity of his conviction.

### A. Failure to Record Grand Jury Proceedings

Appellant complains that the prosecutor's comments to the grand jury were not re-

corded. The trial court denied motions to require recording of the grand jury proceedings and to dismiss the indictment for failure to do so. The government did record the testimony of witnesses before the grand jury.

■ The far better practice is to record grand jury proceedings, including the comments of the prosecutor. *See United States v. Peden*, 472 F.2d 583 (2d Cir. 1972). Nevertheless there remains no constitutional or statutory requirement of recording. *See United States v. Flanagan*, 445 F.2d 263 (5th Cir. 1971), *United States v. Howard*, 433 F.2d 1 (5th Cir. 1970). Accordingly, the failure to do so, standing alone, provides no predicate for reversal.

■ A defendant may nevertheless obtain what grand jury records do exist or receive a hearing on what has transpired in the grand jury room upon a showing of need. *See United States v. Tucker*, 526 F.2d 279, 282 (5th Cir. 1976); *United States v. Howard, supra*, 433 F.2d at 2–3. That showing, however, must include more than unsubstantiated, speculative assertions of improprieties in the proceedings.

■ Appellant's only allegation of prosecutorial misconduct in the grand jury proceedings themselves is that the prosecutor concentrated his questioning of several witnesses on their conversations with their own or appellant's lawyers. From this appellant argues that the prosecutor improperly misinformed the grand jury that Rubin was obstructing the investigation. Assuming a defendant's substantive right to dismiss an indictment based on prosecutorial misconduct so flagrant as to deny fundamental fairness, we cannot regard appellant's speculation as a sufficient demonstra-

---

11. Appellant does not and could not claim that the single explicit reference during Wells's testimony to the privilege against self-incrimination prejudiced him by creating a substantive inference of Wells's guilt that transferred to the defendant. *See United States v. Natale, supra; United States v. Glasser, supra*. That reference, though volunteered by Wells, was certainly foreseeable by the prosecutor. The

government cannot escape blame for any prejudice that might have arisen. Nevertheless it is clear that no such prejudice did arise. The government at trial consistently showed that the subordinates knew nothing of appellant's financial machinations; there was in the circumstances no suggestion to the jury of the witnesses' involvement in criminal behavior related to the charge against appellant.

tion of need to require reversal for the district court's failure to require recording, to order production of existing grand jury records, or to conduct a hearing inquiring into the prosecutor's action.

### B. Electronic Surveillance Claim

■ Appellant also claims that the trial court improperly handled his suggestion that government agents had conducted illegal electronic surveillance of his office. Under 18 U.S.C. § 3504(a)(1), a defendant by asserting a claim of such surveillance requires the government to affirm or deny its occurrence.[12]

This court has made clear that a "mere assertion" by a criminal defendant claiming surveillance of himself is sufficient without supporting evidence to trigger the government's obligation to affirm or deny. *See United States v. Tucker*, 526 F.2d 279, 282 (5th Cir. 1976). However, we have also announced adherence to the requirement that the assertion of surveillance be a "positive statement that unlawful surveillance has taken place." *Id.*[13] An allegation that it "may" have occurred will not suffice.

Appellant failed to meet this requirement. Like the claimant in *Tucker*, he filed a motion alleging only a suspicion of surveillance, that he had "reason to believe" someone had eavesdropped on conversations in his office. The statutory provision for discovery of illegal surveillance is a salutary one; it is not too much, however, to require a positive representation of such surveillance before the government's obligation to respond arises. In any event that requirement is already the law of this circuit.

■ In passing we caution the government against further use of the form of limited response it did offer below. While an unadorned denial of illegal surveillance may suffice to meet the barest, most general accusation, that response must unequivo-

cally deny the occurrence of illegal surveillance, apart from any question whether evidence against the defendant was obtained thereby. While such a general denial may have been the intended import of the government's statement here that "no illegal activities were used to gain evidence concerning Bernard Rubin", the ambiguity created by the negative pregnant would render this response inadequate.

### C. Racketeering Instruction

■ Lastly Rubin objects to the district court's instructions defining the racketeering offense set out in 18 U.S.C. § 1962(c). That section of the Organized Crime Control Act of 1970 provides:

> It shall be unlawful for any person employed by . . . any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

The statute defines "racketeering activity" to include the offenses of embezzlement from union funds and employee welfare benefits plans. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" comprehends two or more such offenses within a ten year period. 18 U.S.C. § 1961(5).

Appellant's concern is the requirement of § 1962(c) that the offender conduct or participate in the conduct of an enterprise's affairs, here the affairs of the unions and the benefit plans, *through* a pattern of racketeering activity. He contends that the statute requires the government to prove that he acquired or maintained his labor union control by virtue of acts of embezzlement, or that those acts somehow furthered his ability to participate in or conduct the affairs of the enterprises. The government maintains that to convict under the racketeering statute the jury need only have

---

**12.** 18 U.S.C. § 3504(a)(1) reads in full as follows:

> Upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an

unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act.

**13.** There is no requirement that the allegation be sworn.

found two offenses during the course of appellant's employment with one of the organizations.

Then District Judge Fay steered a middle course. Tracking the language of the statute, he instructed the jury that the government had to prove that "through" the two or more offenses, the defendant participated in the conduct of affairs of the various union entities. Judge Fay rejected appellant's only suggestion for incorporating his reading of the statute into the instructions, which was to include a statement that "through" means "by means of". The judge also rejected an instruction proposed by the government along the lines of its interpretation of § 1962(c).

The language of § 1962(c) is less than pellucid, and appellant's attempt to illumine has appeal. The "Statement of Findings and Purpose" that introduces the Organized Crime Control Act of 1970 contains some suggestion that Congress primarily concerned itself with the use of racketeering activity to gain and maintain positions in legitimate business and labor organizations. See Pub.L. No. 91–452, 84 Stat. 922 (1970), *reprinted in* [1970] U.S.Code Cong. and Ad.News 1073. The Ninth Circuit has emphasized the importance to a § 1962(c) prosecution of establishing a substantial nexus between the prohibited activity and the conduct of the enterprise's affairs in *United States v. Campanale*, 518 F.2d 352 (9th Cir. 1975). On the other hand, one court has found the statute satisfied by two or more offenses committed in the course of employment with the relevant enterprises, so long as the offenses are themselves related. *See United States v. Stofsky*, 409 F.Supp. 609 (S.D.N.Y.1973), *aff'd.* 527 F.2d 237 (2d Cir. 1975).

We find it unnecessary to attempt definitive resolution of this issue. Assuming some required relationship between the proscribed acts and the maintenance of union position, we find the trial court's instructions sufficient to convey that meaning. At least we cannot find reversible error in the failure to add the proffered words "by means of". Appellant's definition might have emphasized the nexus, but would have added little content to the definition of so common a word as "through." The evidence was certainly sufficient to support a conclusion that appellant's embezzled funds served his position in the union organizations.

■ Having found no prejudicial error in the proceedings that culminated in appellant's conviction, we affirm that judgment. Appellant has, however, raised a substantial objection to one aspect of his sentence, to which we now turn.[14]

III. Forfeiture of Union Offices

■ Upon appellant's conviction of the racketeering charges, the district court issued an order pursuant to 18 U.S.C. § 1963(a) that Rubin forfeit his offices in the various unions and employee welfare benefit plans. Additionally, the court ordered forfeiture in perpetuity of the right to hold any such office. Appellant challenges these orders as beyond the intended reach of the forfeiture sanction.

Part of the Organized Crime Control Act of 1970, (hereinafter the "Act"), 18 U.S.C. § 1963(a) provides:

> Whoever violates any provision of section 1962 . . . shall forfeit to the United States . . . (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

14. Appellant raised four other claims of error. We reject as meritless the claim relating to discovery of an Internal Revenue Service file and that relating to the presence before the grand jury of Department of Justice Organized Crime and Racketeering Strike Force attorneys. Two claims, one asserting that the trial court improperly excluded certain defense evidence as hearsay and one challenging the court's instructions on the fiduciary duties of a union official under 29 U.S.C. § 501(a), were raised pertinent to the embezzlement counts that charged unlawful salary increases. We need not reach these claims because of the operation of the concurrent sentence doctrine.

The question before us is whether appellant's various offices are "interests", "securities", "claims", or "property or contractual right of any kind", within the meaning of § 1963(a). Given Congress' clear intent to use every possible means to separate those found guilty of racketeering activity and their confederates from the enterprises they had conducted through such activity, we find no basis in language or policy for excluding those offices appellant presently holds from the reach of the forfeiture provision. The terms of that provision, however, cannot reach appellant's right to seek and reattain such offices. That right, moreover, is independently regulated by provisions of the federal labor statutes. Accordingly, we modify the forfeiture order entered below, restricting its application to appellant's incumbent status in the enumerated offices.

As a criminal statute, § 1963 "must be strictly construed, and any ambiguity must be resolved in favor of lenity." *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973). This canon has particular application to forfeiture statutes. *See Baca v. Commissioner,* 326 F.2d 189 (5th Cir. 1964). Indeed, the forfeiture of a portion of an individual's property as a consequence of a criminal conviction was unknown to the federal criminal law until the passage of § 1963.[15] Such a .penal foray bespeaks a need for circumspection.

That circumspection nevertheless must give fair heed to the clear congressional intent to increase the variety and strength of federal prosecutorial weapons designed to root out and keep out the influence of organized crime in legitimate business and labor organizations. Congress found the traditional criminal sanctions of imprisonment and fine wanting in the effort against infiltration by organized crime. Incarcerating individuals could remove them from the operation of victimized organizations. So long as those individuals retained or could transfer economic leverage over the organizations, however, removing them to prison often resulted only in the rule by proxy or in the promotion of junior members of organized crime. As the Senate Judiciary Committee stated, "What is needed here . . . are new approaches that will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat." S.Rep. at 78 (1969); *see also Measures Relating to Organized Crime: Hearings on S.30 and Related Proposals Before the Subcommittee on Criminal Laws and Procedures of the Senate Judiciary Committee,* 91st Cong., 1st Sess. 112 (1969) (statement of Attorney General) (hereinafter "Senate Hearings"); *Organized Crime Control: Hearings on S.30 and Related Proposals Before Subcommittee No. 5 of the House Judiciary Committee,* 91st Cong.2d Sess. 107 (Statement of Sen. McClellan) (hereinafter "House Hearings"); 116 Cong.Rec. 35193 (1970) (remarks of Rep. Sisk).

The criminal forfeiture provision is one attempt to destroy that economic base. Thus Congress clearly contemplated forfeiture of any ownership or investment type

---

**15.** Unlike *in rem* forfeiture proceedings against contraband or articles put to unlawful use, § 1963 operates against the person of the defendant and includes within the punishment for his crime forfeiture of a portion of his estate. Such a provision, while known to the common law of England and the colonies, is foreign to the federal criminal law. The 91st Congress recognized that, in passing § 1963, it was partially repealing a statute passed by the First Congress, which in its present form provides that: "No conviction or judgment shall work corruption of blood or forfeiture of estate." 18 U.S.C. § 3563. *See United States v. Mandel,* 408 F.Supp. 679 (D.Md.1976); S.Rep. 91–617, 91st Cong., 1st Sess. 79–80 (1969), hereinafter

S.Rep.); 116 Cong.Rec. 35205, 35208 (remarks of Rep. Mirka, Rep. Ryan).

Besides the unprecedented nature of the forfeiture sanction, the uncertain reach of "patterns of racketeering activity"—the gravamen of a § 1962 offense—requires interpretive caution in this area. See Part II. A., *supra.* While addressed to organized crime, the Act is not limited in application to members of that undertaking. *See United States v. Campanale, supra.* Indeed, while we readily conclude appellant was properly convicted under the racketeering provisions we intend to intimate no finding or sense of any kind that he is or has been affiliated with what might be labeled organized crime.

of interest a defendant might hold in an organization he had conducted through a pattern of racketeering activity. It is just such an interest that would not otherwise terminate with incarceration and would enable a defendant and/or his confederates to maintain control of an organization.

The question is whether that language of § 1963(a)—interest, security, claim, property or contract right—should be extended beyond such financial interests to elective or appointive management positions such as those held by appellant. The scope of the statute is indeed without precise boundaries.[16] Appellant's management positions do not present the same problem regarding perpetuation of control that ownership interests create.

Nonetheless we conclude that appellant's entitlement under the organic documents of the various entities to serve the remainder of his terms of office falls within the language of the statute. So far as the record demonstrates, his rights under the charter and constitutions of the various organizations to serve out his terms of office are as contractual in nature as an employee's rights under an employment agreement for a term of years, terminable for cause. The terms of the forfeiture provision reach beyond any narrow definition of capital investment, embracing "property or contractual right of any kind." The Senate Judiciary Committee wrote that the language "is designed to accomplish a forfeiture of any interest of any type in the enterprise . . . ." S.Rep. at 79. While such open-ended intent cannot legitimate extension of the sanction beyond the statute's plain terms, limited to their reasonably foreseeable scope, neither can it be disregarded.

Construing § 1963 to encompass the positions appellant holds also accords with congressional intent. First, retention of a management position, even *in absentia,* could permit a defendant convicted under the racketeering provisions to continue to exert an influence over an enterprise. Moreover, although Congress' primary concern in enacting the forfeiture provision was eradicating organized crime's economic base, which more readily translates into ownership interests, it also intended forfeiture fully to serve the broader goal of legally separating persons who run an enterprise through the defined racketeering activity from the enterprise itself. See S.Rep. at 79.[17] Although applying § 1963 to appellant's offices may serve only this broader goal and be unrelated to eliminating self-perpetuating economic power, there remains no reason to conclude that those offices lie outside the sanction's reach.

In short, a reasonably cautious interpretation of the language of the forfeiture provision brings within its reach the right under an organization's charter to serve out a specified term in an elective or appointive management position of substantial influence. Such an interpretation serves the policies identified by Congress in enacting the statute. Because both those conditions are satisfied, the order that appellant forfeit his present positions in the various union entities is proper.[18]

The forfeiture sanction, however, can have no proper effect on appellant's right in the future to seek union office, including those offices he must now give up. That right to run for and hold office is not something appellant as an individual has acquired or maintained with respect to the

---

**16.** Judge Fay below explicitly noted the ambiguity in the statute:

I would want the record to show that this is apparently a gray area. It's difficult to say that the statute is precise or specific, because when it talks in terms of forfeiting something to the Government, you would ordinarily think of money or property, or something of that sort. (R. 821–22).

**17.** Senator McClellan, a sponsor of the provision, explained to the House subcommittee that the forfeiture sanction would "punish the crim-

inal appropriately by forfeiting to the government his ill-acquired interests . . . and directly aid the business community by expelling him from the legitimate business he abused." House Hearings at 107.

**18.** That those offices cannot be meaningfully transferred to the United States is of no moment. 18 U.S.C. § 1963(c) provides that a forfeited interest not exercisable by the United States shall terminate.

various union entities; it is the same right possessed by all members of all unions. In no sense a contractual or property right held by the individual against a union, the right to seek union office is rather guaranteed by federal statute. *See* 29 U.S.C. 481(e). The language of the new penal statute does not extend to such a right.

Moreover, the forfeiture provision itself contains no prophylactic ban on reacquisition of the same interest as that forfeited. Nothing in § 1963 prevents an individual from investing funds in an enterprise in which he has had to forfeit a previous investment. Such an interpretation does not rob the sanction of its deterrent effect, which results from the heavy financial loss that can be visited by a forfeiture order. *See* Senate Hearings at 388 (statement of Assistant Attorney General Will Wilson). Even in the context of a management position, forfeiture without restriction on reentry removes from the convicted defendant the advantages of incumbency.

Finally, restricting the operation of the sanction to presently-held interests is supported by the fact that Congress specifically attended to the problem of reacquisition in the civil remedies of § 1964. Included among those remedies are injunctions against a defendant conducting in the future the same type of enterprise he conducted through racketeering activity in the past. That powerful measure was rightfully addressed to the district court's equitable discretion and not made a part of the forfeiture sanction that attaches automatically upon conviction under § 1962.

The analysis thus far would apply to a distinction between any presently-held interest and the right to regain that interest. Limiting forfeiture to the former, makes particular sense in the context before us, moreover, because labor code provisions independently regulate appellant's right to seek union office in the future.

Assuming appellant's embezzlement convictions become final, it will be unlawful for him to serve as an officer of a labor organization or a trustee of an employee welfare benefit plan. 29 U.S.C. §§ 504, 1111. That ban continues for five years following the conclusion of imprisonment, subject to the discretion of the Board of Parole to lift the restraint. Nowhere in the legislative history of the Organized Crime Control Act of 1970 does there appear a reference to this restraint on the right to seek union office, which attaches upon conviction of many of the offenses included in the 1970 Act's definition of racketeering activity.

We do not read the criminal forfeiture provision as imposing a permanent ban on reacquisition of any covered interest. The statute creates no rule of perpetuity. It has a limited temporal reach with which we have no right, no power, to tamper. In any case we cannot find in § 1963 any authority to impose the radical measure of a lifetime ban on holding union office when that statute was passed completely without regard to the five year ban in existence at the time of enactment. Insofar as the district court ordered appellant to forfeit his right to seek and hold office in the labor organizations and employee welfare benefit plans, that order must be reversed. Appellant's rights in that regard are committed to the operation of 29 U.S.C. §§ 504, 1111.

CONCLUSION

The judgment of conviction is AFFIRMED. The order of forfeiture is AFFIRMED AS MODIFIED.